UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Angela Jo Moore and M. Porter
Moore

    v.                                   Civil No. 10-cv-241-JL
                                                Opinion No. 2012 DNH 021

Mortgage Electronic Registration
Systems, Inc., et al.

**MEMORANDUM ORDER**

Plaintiffs Angela Jo Moore and M. Porter Moore, proceeding pro se, have brought a 17-count complaint against a number of entities involved in the origination, servicing, and eventual foreclosure of their mortgage loan.  The Moores allege a variety of malfeasance by the defendants, including misleading plaintiffs about the terms of their loan, failing to respond to their requests for information regarding their loan, and proceeding with foreclosure despite ongoing negotiations to modify the loan.  The defendants have all filed motions to dismiss, arguing that plaintiffs' third amended complaint fails to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

This court has diversity jurisdiction over this matter between the Moores, who are New Hampshire citizens, and defendants, various out-of-state corporations, under 28 U.S.C. § 1332 since the amount in controversy exceeds $75,000.  The court also has jurisdiction under 28 U.S.C. § 1331 (federal

question) and 1367 (supplemental jurisdiction) by virtue of the

Moores' claims under various federal statutes.

After hearing oral argument, the court grants the motions in

part and denies them in part.  As explained in more detail below:

- Count 1, a claim for "agency/respondeat superior," is dismissed because those doctrines are not causes of action for which recovery can be granted, but bases for holding a defendant vicariously liable for another's conduct.

- Counts 2 and 3, claims against defendant WMC Mortgage Corp. for violation of the Truth in Lending Act and its implementing regulation, Regulation Z, are dismissed because the Moores did not file suit against WMC within the statute's limitations period.  Plaintiffs' remaining state-law claims against WMC, including their claim for "origination fraud" in Count 8, are likewise dismissed under the applicable statute of limitations.

- Count 4, a claim against defendant Ocwen Loan Servicing, LLC under the Real Estate Settlement Procedures Act, is not dismissed.  Contrary to Ocwen's argument, the Moores have sufficiently pleaded that they suffered actual damages--in the form of emotional distress--as a result of its statutory violation.

- Count 5, which makes claims against Ocwen and its co-defendant Harmon Law Offices under the Fair Debt Collection Practices Act, is not dismissed.  Though Harmon argues that it was not engaged in "debt collection" subject to that statute, Harmon's own representations in its letters to the Moores suggest otherwise.

- Count 6, a claim for violations of the New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act, is dismissed as to Harmon because the Moores have not pleaded facts stating a plausible claim for relief under that statute.

- Count 7, a claim for breach of the covenant of good faith and fair dealing, is dismissed because the Moores have not pleaded facts showing the existence of a contract between them and certain of defendants--which is a necessary element

of such a claim--and because they have not plausibly alleged
that the remaining defendants (with whom the Moores did have
a contractual relationship) committed any such breach.

- Count 8, a claim for fraud, is dismissed as to Harmon
  because the Moores have not pleaded their claim against it
  with sufficient specificity.  Count 8 is also dismissed
  insofar as it claims fraud in the assignment of the Moores'
  mortgage because they did not rely on the alleged fraud.
  The Moores' claim for "modification fraud" against Ocwen and
  its co-defendant Saxon Mortgage Services, Inc., however, is
  pleaded with the particularity required by Federal Rule of
  Civil Procedure 9 and may proceed.

- Count 9, a claim for fraud in the inducement against Saxon
  and Ocwen, is dismissed because the Moores do not allege
  that they entered into any transaction as a result of the
  claimed fraud by either of these parties.

- Counts 10, 12, and 13, claims against all defendants for
  negligence, breach of assumed duty, and breach of fiduciary
  duty, respectively, are dismissed because the allegations
  set forth in the complaint do not support the conclusion
  that any of the defendants owed the Moores a duty of any
  kind (apart from, as to certain defendants, contractual
  ones).

- Count 11, a claim for intentional and negligent
  misrepresentation against all defendants, is dismissed as to
  Harmon and its co-defendants Mortgage Electronic
  Registration Systems, Inc., Deutsche Bank National Trust
  Company, Morgan Stanley ABS Capital I Holding Corp., and
  Morgan Stanley ABS Capital I Inc. Trust 2007-HE5.  The
  claims against those defendants are not pleaded with the
  particularity required of fraud claims by Federal Rule of
  Civil Procedure 9.  The Moores' claim against Saxon and
  Ocwen for intentional and negligent misrepresentation are,
  however, sufficiently pleaded and may proceed.

- Count 14, a claim for civil conspiracy against all
  defendants, is dismissed.  The Moores' complaint does not
  contain allegations sufficient to establish the existence of
  an agreement among defendants to engage in a common course
  of conduct.  See Bell Atlantic Corp. v. Twombly, 550 U.S.
  544 (2007).

- Count 15, which makes claims for negligent and intentional infliction of emotional distress against all defendants, is dismissed.  In the absence of a duty from the defendants to the Moores, they cannot recover for negligent infliction of emotional distress.  Nor do defendants' alleged actions constitute the type of "extreme and outrageous conduct" necessary to recover for intentional infliction of emotional distress.

- Count 16, a claim for promissory estoppel against Ocwen, is dismissed as the Moores have not pleaded any facts indicating that they relied to their detriment on Ocwen's alleged promise to hold off foreclosing for three months.

- Finally, Count 17, a claim for "avoidance of note" against "all defendants claiming to own the note and mortgage," is not dismissed.  Though defendants argue that under New Hampshire law, they need not possess the Moores' promissory note in order to foreclose on the associated mortgage, possession of the note <u>is</u> a necessary prerequisite of a claim to enforce it, which is what the Moores seek to avoid through this count.

## I.  <u>Applicable legal standard</u>

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  The court "may consider not only the complaint but also "facts extractable from

4

documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).  With the facts so construed, "questions of law [are] ripe for resolution at the pleadings stage." Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  The following background summary is consistent with that approach.

## II.  <u>Background</u>

### A.  **Origination of the Moores' loan**

In late 2006, a mortgage broker employed by First Guaranty Mortgage contacted plaintiff Angela Jo Moore about refinancing the mortgage on the Sandwich, New Hampshire home she shares with her husband, plaintiff M. Porter Moore.  The broker, Joseph Celone, told the Moores that if they refinanced through First Guaranty's "Credit Rebuilding Program," they could lower their monthly mortgage payments, which were $2,200 at the time.  With Celone's help, Mrs. Moore applied and was approved for an adjustable rate loan in the amount of $452,000 from defendant WMC Mortgage Corporation.  Though Mr. Moore's name appeared on the deed to the property, he was not a co-borrower on the loan.

Celone told the Moores that theirs was a "special" loan from a brand-new Fannie Mae program designed specifically for the

self-employed.  He told them that, while they could expect their mortgage payments for the first three months to be slightly higher than their previous payments, Fannie Mae would automatically send them paperwork--which First Guaranty would fill out and submit for no charge--to enroll in the "special" program.  According to Celone, once the Moores' loan was enrolled, their monthly mortgage payments would drop.  Prior to closing, neither Celone nor WMC provided the Moores with certain documents required by federal law, including an ARM disclosure and Good Faith Estimate.

Closing on the Moores' refinancing was scheduled to take place at their home on December 18, 2006 at 6:00 p.m., but the woman who performed the closing did not arrive until about 10:00 p.m.[1]  The closing was rushed, as the woman was concerned about the deteriorating condition of the roads due to the weather and claimed that her husband was waiting for her in the car.  She did not provide the Moores with a copy of the closing documents, but said she would either mail them or drop them off in the next several days.  Despite this assurance, the Moores never received copies of the closing documents, including a Notice of Right to Cancel.

---

[1]The third amended complaint does not identify this person any more specifically.

After closing, the Moores discovered that the terms of their loan were not what they had been led to believe.  Compared to their previous monthly payment of $2,200, which covered principal, interest, taxes, and insurance, their new monthly payment was $3,400 and covered only principal and interest.  When the Moores did not receive any paperwork from Fannie Mae to enroll in the "special program" Celone had told them about, they contacted First Guaranty.  A representative from First Guaranty advised the Moores that Celone had been terminated due to his "questionable business practices," and attempted to persuade the Moores to again refinance their loan--an offer they declined. Contrary to what Celone had told them, the Moores' loan was never enrolled in any Fannie Mae program, "special" or otherwise.

**B.   Modification efforts and servicing**

In June 2008, the Moores contacted their loan servicer, defendant Saxon Mortgage Services, Inc., to seek a modification because, under the terms of their adjustable rate loan, their payments were increasing.  These efforts were unsuccessful, and in October 2008 the Moores stopped making their loan payments. In April 2009, Saxon entered into a contract with the federal government, under which it agreed to modify loans under the government's Home Affordable Modification Program ("HAMP").  The following month, Saxon sent a letter to Mrs. Moore informing her

that her loan was in default and that foreclosure proceedings had been initiated.  The letter also told Mrs. Moore that Saxon wanted to "help keep [her] in [her] home" and instructed her to call to discuss her options.

Mrs. Moore contacted Saxon, which encouraged her to contact a different company, Titanium Solutions, to pursue a loan modification.  When Mrs. Moore contacted Titanium, it informed her that it did not modify "jumbo loans" and referred her back to Saxon.[2]  Mrs. Moore then contacted Saxon again, which also informed her that it did not modify jumbo loans, and in fact, did not even typically service jumbo loans.  Saxon told Mrs. Moore that in order to modify her loan, she would need to seek out a third-party company that would modify jumbo loans.  The Moores requested that Saxon supply them with certain paperwork so they could evaluate their situation, but Saxon failed to do so, claiming on different occasions that it did not have the documents on its premises, that its call centers did not deal with paperwork, and that the Moores needed to request the documents in writing.

---

[2]A "jumbo loan," also known as a non-conforming loan, "is a loan that exceeds Fannie Mae's and Freddie Mac's loan limits." U.S. Department of Housing & Urban Development, Glossary, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/buying/glossary (last visited Jan. 23, 2012).

In July 2009, the Moores received two letters from defendant Harmon Law Offices informing them that Saxon had retained Harmon to foreclose on their mortgage on behalf of defendant Mortgage Electronic Registration Systems ("MERS").  MERS, as nominee for WMC, was the mortgagee of record for the Moores' mortgage.  One of the letters informed the Moores that the loan had been accelerated so that the entire outstanding balance (at that time, $493,555.36) was due immediately.  The Moores contacted Harmon to verify the debt, but received no response, and thereafter heard nothing further from Saxon or Harmon regarding the announced foreclosure.

In November 2009, the servicing of the Moores' loan was transferred from Saxon to Ocwen Loan Servicing, LLC.  Later that month, Ocwen sent the Moores a letter titled "Alternatives to Foreclosure."  The letter claimed that the process to review the Moores' loan for modification would take up to 30 days once Ocwen had received all necessary information.  On December 7, 2009, the Moores sent a notarized letter to Ocwen asking it to verify the debt and to provide copies of all documents related to their loan.  In February 2010, Harmon responded to the Moores' letter, but without providing any of the documents requested.  The Moores sent Ocwen a second letter on March 23, 2010, via certified mail.

Though Ocwen signed for the letter, it never acknowledged receipt of or otherwise responded to it.

Around the same time the Moores sent their first letter in December 2009, Ocwen began calling their home, often multiple times per day, in an effort to collect past due mortgage payments.  These calls continued for months.  Ocwen, like Saxon, had entered into a contract with the federal government to modify loans under HAMP.  During the calls, Ocwen encouraged the Moores to apply for a loan modification and told the Moores that they would send a modification application and other related documents.  The Moores never received the promised documents.

### C.    Foreclosure proceedings and removal

In late January 2010, Ocwen sent the Moores a Reinstatement Quote informing them that the total amount due by April 1, 2010 to reinstate their loan was $79,151.46.  Not long thereafter, on February 20, 2010, Harmon sent Mr. and Mrs. Moore each a separate Notice of Mortgage Foreclosure Sale.  The Notices informed the Moores that a foreclosure sale of their property would take place on March 18, 2010, on behalf of defendant Deutsche Bank National Trust Company, as Trustee for the registered holders of Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 Mortgage Pass-Through Certificates, Series 2007-HE5.  MERS had assigned the Moores'

mortgage to Deutsche Bank on February 18, 2010, in an assignment reciting an effective date of November 16, 2009.[3]

The Moores continued to pursue a modification from Ocwen. On March 16, 2010--two days before the scheduled foreclosure sale--a "Home Retention Consultant" from Ocwen e-mailed the Moores paperwork to apply for a modification.  Ocwen instructed the Moores that the completed paperwork would need to be returned the following day.  It refused to reschedule the sale.

On March 17, 2010, the Moores filed suit against Ocwen, MERS, Deutsche Bank, and Morgan Stanley ABS Capital I, Inc. in Carroll County Superior Court, seeking, among other things, ex parte emergency injunctive relief to prevent the foreclosure sale.  The Superior Court provisionally granted an injunction pending a hearing on the merits.  As a result, the scheduled foreclosure sale did not take place.[4]  Following the hearing, on March 25, 2010, the court denied the Moores' request for preliminary injunctive relief, finding, based upon an offer of

---

[3]The assignment, which was filed with the Carroll County registry of deeds on February 18, 2010, was signed by Juan Pardo as Vice President of MERS.  The Moores allege that Pardo is not an employee of MERS, but of Ocwen, though they do not allege that Pardo lacked authority from MERS to assign the mortgage.

[4]The complaint alleges that on the date of the scheduled sale, an auctioneer arrived at the Moores' property and informed them that the foreclosure sale had been rescheduled for April 20, 2010.  But no foreclosure sale has actually taken place, and the Moores confirmed at oral argument that they continue to occupy the property.

proof from Deutsche Bank and Ocwen (who were represented by
Harmon at the hearing), that the Moores had not submitted all
necessary paperwork to pursue a modification of their loan.

The Moores subsequently sent Ocwen all paperwork necessary
to apply for a modification, and on May 17, 2010, filed a new
suit against Ocwen, MERS, and Saxon seeking to enjoin the
foreclosure.  This action included claims under the New Hampshire
Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, the New
Hampshire Unfair, Deceptive or Unreasonable Collection Practices
Act, N.H. Rev. Stat. Ann. § 358-C, and for common law fraud and
negligence.  Ocwen, MERS, and Saxon removed the case to this
court, see 28 U.S.C. § 1441(a), invoking the court's diversity
jurisdiction, see id. 1332.  After removal, the Moores amended
their complaint several times to add new defendants and counts,
culminating in the third amended complaint now before the court.


III.  **Analysis**

A.  ***Preclusive effect of prior state court action***

Before turning to defendants' arguments challenging the
sufficiency of specific counts of the complaint, the court
addresses a defense certain defendants have raised to this action
in its entirety.  Ocwen, MERS, and Deutsche Bank argue that the
outcome of the first state court action, in which the Moores were

12

denied preliminary injunctive relief, precludes them from litigating their claims here under the doctrine of res judicata. Their theory is that even though the Superior Court's ruling did no more than deny preliminary relief, "it is effectively a final order where a foreclosure is pending and was treated that way by the Court and the parties." This argument is without merit.

"New Hampshire law determines the preclusive effect this court must give to judgments issued by the courts of that state." Estate of Sullivan v. Pepsi-Cola Metro. Bottling Co., Inc., 2004 DNH 014, at 4-5. Under New Hampshire law, "[t]he doctrine of res judicata prevents parties from relitigating matters actually litigated and matters that could have been litigated in the first action." Gray v. Kelly, 161 N.H. 160, 164 (2010) (emphasis omitted). As the parties asserting the defense of res judicata, Ocwen, MERS, and Deutsche Bank bear the burden of proof as to the applicability of that defense. Strobel v. Strobel, 123 N.H. 363, 365-66 (1983). They must demonstrate the following three elements: "(1) the parties are the same or in privity with one another; (2) the same cause of action was before the court in both instances; and (3) the first action ended with a final judgment on the merits." Gray, 161 N.H. at 164. In this case, the third element--a final judgment on the merits--is absent.

The Superior Court's denial of preliminary injunctive relief did not constitute a final judgment on the merits.  In New Hampshire, as elsewhere, "preliminary injunctions serve only to preserve the status quo until a trial on the merits is held." N.H. Dep't of Envtl. Servs. v. Mottolo, 155 N.H. 57, 61 (2007). For that reason, the New Hampshire Supreme Court has held that "it is generally inappropriate for a trial court at the preliminary-injunction state to give a final judgment on the merits." Id.

Contrary to the argument made by Ocwen, MERS, and Deutsche Bank, there is no reason to believe the Superior Court departed from that general rule here.  In fact, the court's order expressly recognized that it did not dispose of the case:  the court stated that the Moores had not "shown a likelihood that they will prevail on the merits of the case," not that the Moores did not or could not prevail.  The determination made by the state court was merely that, in seeking a preliminary injunction, the Moores had not presented sufficient evidence to support the grant of injunctive relief.  That determination does not bar the Moores from pursuing their claims against Ocwen, MERS, and Deutsche Bank here.  See Veale v. Town of Marlborough, No. 92-355-SD, 1994 WL 263700, *3 (D.N.H. April 11, 1994) ("[A] decision on a preliminary injunction does not amount to a final judgment

on the merits, and issues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel.").

Moreover, the record before the court does not indicate what happened in the first state-court action after the state court denied the Moores' request for preliminary injunctive relief. Deutsche Bank claims, without citation to any documents before the court, that the Superior Court "closed its file after no further filings were received and the appeal period expired." But Deutsche Bank does not explain how "closing the file" is equivalent to dismissal with prejudice, entry of judgment, or some other act amounting to a final adjudication on the merits. Because Ocwen, MERS, and Deutsche Bank have not carried their burden of proof, their motion to dismiss the claims against them as barred by res judicata is denied.

### B.   *Count 1 - Agency/Respondeat Superior*

Count 1 of the Moores' complaint makes a claim for "Agency/ Respondeat Superior" against WMC, MERS, Deutsche Bank, Morgan Stanley ABS Capital I Holding Corp., and Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 (the court will refer to the latter two collectively as "the Morgan Stanley defendants").  The complaint maintains that Ocwen, Saxon, and Harmon were agents of

these other defendants, so that they are liable for the wrongful conduct of Ocwen, Saxon, and Harmon.

Deutsche Bank argues, correctly, that agency and respondeat superior are not independent causes of action, but doctrines holding a principal vicariously liable for the unlawful conduct of its agent.  See Dent v. Exeter Hosp., Inc., 155 N.H. 787, 792-93 (2007) (describing agency); Porter v. City of Manchester, 155 N.H. 149, 152 (2007) (describing respondeat superior). Therefore, to the extent the Moores are attempting to assert an independent cause of action under either doctrine, they may not do so and that cause of action is dismissed.  The court will, however, consider the doctrines and their supporting factual allegations in considering whether the complaint states claims against WMC, MERS, Deutsche Bank, and the Morgan Stanley defendants liable for the allegedly wrongful conduct of Ocwen, Saxon, or Harmon.

## C.   *Counts 2 and 3 - Truth in Lending Act and the Moores' state-law claims against WMC*

In Counts 2 and 3 of their complaint, the Moores make claims against WMC, the originator of their refinanced loan, for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and its implementing regulation, Regulation Z, 12 C.F.R. Part 226.  The Moores allege that WMC failed to provide them with

the disclosures mandated by TILA and Regulation Z at or prior to
closing.  In addition, the Moores have brought various state-law
claims against WMC.[5]  WMC argues that all of the claims against
it are barred by the applicable statutes of limitations:  TILA's
one-year statute of limitations, see 15 U.S.C. § 1640(e), in the
case of the Moores' federal law claims; and New Hampshire's
general three-year statute of limitations in the case of their
state-law claims, see N.H. Rev. Stat. Ann. § 508:4, I.  The court
agrees.

TILA's limitations provision (which is also applicable to
claims under Regulation Z, see Nool v. HomeQ Servicing, 653 F.
Supp. 2d 1047, 1051 n.1 (E.D. Cal. 2009)) states that an action
for damages must be brought "within one year from the date of the
occurrence of the violation."[6]  15 U.S.C. § 1640(e).  Where, as
here, the plaintiff's claim is based upon insufficient or
nonexistent disclosures, the limitations period begins running on

---

[5]These claims include agency/respondeat superior (Count 1),
breach of the implied covenant of good faith and fair dealing
(Count 7), origination fraud (Count 8), negligence (Count 10),
intentional and negligent misrepresentation (Count 11), breach of
assumed duty (Count 12), breach of fiduciary duty (Count 13),
civil conspiracy (Count 14), and negligent and intentional
infliction of emotional distress (Count 15).

[6]TILA also contains a three-year statute of limitations for
a claim seeking rescission of the loan.  15 U.S.C. § 1635(f).
Here, the only relief the Moores seek for the alleged TILA
violations in Counts 2 and 3 are damages and attorneys' fees and
costs, see Third Am. Compl. (document no. 47) at 20, ¶ 86, so the
limitations period for rescission claims is not at issue.

the date the disclosures should have been made.  Rodrigues v. Members Mortg. Co., Inc., 323 F. Supp. 2d 202, 210 (D. Mass. 2004); see also Corcoran v. Saxon Mortg. Servs., Inc., No. 09-11468-NMG, 2010 WL 2106179, *3 (D. Mass. May 24, 2010).  Applying this rule, the limitations period on the Moores' TILA and Regulation Z claims began running on December 18, 2006, the date of the loan's closing.  The Moores did not even file this suit, however, until May 17, 2010, and did not make any claims against WMC until November 1, 2010--nearly four years later.

Some district courts within this circuit have held that TILA's statute of limitations may be subject to equitable tolling, such that the running of the limitations period can be suspended in some instances.  See, e.g., Corcoran, 2010 WL 2106179 at *3; Darling v. W. Thrift & Loan, 600 F. Supp. 2d 189, 215 (D. Me. 2009).  Assuming, without deciding, that this doctrine applies to claims under TILA, it cannot save the Moores' claims.  "[E]quitable tolling of a federal statute of limitations is appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands."  Salois v. Dime Sav. Bank of N.Y., FSB, 128 F.3d 20, 25 (1st Cir. 1997).  Such circumstances include the defendant preventing the plaintiff from asserting his rights in some way, Corcoran, 2010 WL 2106179 at *3, or the plaintiff's inability to discover "information

18

essential to the suit" despite reasonable diligence, Darling, 600 F. Supp. 2d at 215.

While the Moores allege that the applicable limitations periods should be tolled because "[t]he deceptive nature" of WMC's actions was "latent and self-concealing," such that it could not, through the exercise of reasonable care, be discovered, Third Am. Compl. (document no. 47) at 17, ¶ 70, this is belied by other allegations in the complaint.  In particular, the complaint reveals that the Moores knew no later than three months after closing, when the promised Fannie Mae paperwork did not arrive and the amount of their monthly mortgage payments did not drop, that something was amiss and that they had not received what they thought they had bargained for.  Id. at 8, ¶ 31.  Thus, the limitations period on the Moores' TILA claims against WMC began running, at the absolute latest, in March 2007[7]--some three and a half years before they first asserted them.  Counts 2 and 3 are therefore dismissed as time-barred.

_____

[7]This view is extremely charitable to the Moores, given the court of appeals' holding in Salois.  There, the court held that because the loan documents contained all the information necessary for the plaintiffs to discover that they had been misled about the terms of their loan, and because "one who signs a writing that is designed to serve as a legal document is presumed to know its contents," the "plaintiffs were on notice of their claims when they signed their loan documents."  128 F.3d at 26 & n.10.  In evaluating the Moores' claims, this court has assumed, dubitante, that the loan documents themselves did not place the Moores on notice of their claims.

The Moores' state-law claims against WMC are likewise time-barred.  Again, all of WMC's alleged misconduct was consummated by the date of closing, and the Moores knew or reasonably should have known of that misconduct no later than March 2007.  Under New Hampshire law, a claim "may be brought only within 3 years of the act or omission complained of" or "within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of."  N.H. Rev. Stat. Ann. § 508:4, I.  The limitations period on the Moores' state-law claims against WMC therefore expired, at the latest, in March 2010.  Because the Moores did not assert their claims against WMC until November 1, 2010, those claims are barred by the statute of limitations, and are dismissed.

**D.   *Count 4 - Real Estate Settlement Procedures Act***

Count 4 of the complaint, brought against Ocwen only, makes a claim for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 et seq.  The Moores allege that their December 7, 2009 and March 23, 2010 letters to Ocwen constituted qualified written requests ("QWRs") under 12 U.S.C. § 2605(e)(1)(B), so that, by failing to acknowledge their receipt within 20 days or to respond within 60 days, Ocwen violated RESPA and is liable to them for actual and statutory damages.  Ocwen

argues that the court should dismiss this claim because the Moores have not pleaded facts supporting an award of either actual or statutory damages.  This argument fails, however, because the Moores allege that, as a result of Ocwen's conduct, they suffered emotional distress, which qualifies as "actual damages" under RESPA.

In relevant part, RESPA requires the servicer of a federally-related mortgage loan to respond to a borrower's QWR by acknowledging receipt within 20 business days, id. § 2605(e)(1)(A), and to provide certain information to the borrower within 60 business days, id. § 2605(e)(2).  If the servicer fails to fulfill these obligations, it may be held liable for "any actual damages to the borrower as a result of the failure," or, "in the case of a pattern or practice of noncompliance," statutory damages.  Id. § 2605(f)(1).

Ocwen does not argue that the Moores' letters were not QWRs as defined by the statute, or that it responded to the Moores as required.  Instead, as noted, Ocwen argues that it may not be held liable under § 2605(f)(1) because the Moores have pleaded neither actual damages from its alleged noncompliance nor a "pattern or practice of noncompliance" that would entitle them to statutory damages.  Ocwen is half right:  its failure to respond to the Moores' two letters does not make out a pattern or

21

practice of noncompliance with RESPA.  See Selby v. Bank of Am., Inc., No. 09-cv-2079-BTM, 2011 WL 902182, *5 (S.D. Cal. March 14, 2011) (holding that two instances of failing to respond to a QWR did not constitute a pattern or practice of RESPA noncompliance); Espinoza v. Recontrust Co., N.A., No. 09-cv-1687-IEG, 2010 WL 2775753, *4 (S.D. Cal. July 13, 2010) (same); McLean v. GMAC Mortg. Corp., 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009) (same); In re Maxwell, 281 B.R. 101, 123 (Bkrtcy. D. Mass. 2002) (same). The Moores have pleaded no other facts establishing the existence of such a pattern or practice, and thus cannot recover statutory damages.

The Moores have, however, stated a plausible claim for actual damages under § 2605(f)(1)(A).  "In order to plead 'actual damages' sufficiently, the plaintiff must allege specific damages and identify how the purported RESPA violations caused those damages." Okoye v. Bank of N.Y. Mellon, No. 10-cv-11563-DPW, 2011 WL 3269686, *17 (D. Mass. July 28, 2011) (citing cases). While the Moores do not allege that they suffered any pecuniary damages resulting from Ocwen's alleged RESPA violations, they do allege that, as a result of Ocwen's entire course of conduct (and that of other defendants), they have suffered "severe mental

anguish" and "emotional distress."  Third Amended Complaint

(document no. 47) at ¶ 173.[8]

RESPA permits recovery for "<u>any</u> actual damages to the

borrower."  12 U.S.C. § 2605(f)(1) (emphasis added).  Because

RESPA is a consumer protection statute, the court construes this

language "liberally in favor of consumers," as required by the

court of appeals, see Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d

164, 171 (1st Cir. 2004), and concludes that "actual damages"

include damages for emotional distress (provided, of course, that

there is a causal relationship between that distress and the

alleged RESPA violation, something that Ocwen has not contested

in its motion to dismiss).  At least two courts of appeals have

reached the same conclusion.  See Catalan v. GMAC Mortg. Corp.,

629 F.3d 676, 696 (7th Cir. 2011) ("[E]motional distress damages

are available as actual damages under RESPA, at least as a matter

of law."); McLean v. GMAC Mortg. Corp., 398 Fed. Appx. 467, 471

--------------------

[8]Although this allegation appears in a separate count of the
complaint, because the Moores are pro se the court reads their
complaint "with an extra degree of solicitude." Hecking v.
Barger, 2010 DNH 032, at 4.  The allegation specifically ties the
Moores' emotional distress to Ocwen's alleged conduct--which
includes its failure to respond to their letters--and to ignore
it simply because it does not appear in the RESPA count itself
would elevate form over substance.  Indeed, in their objections
to the motions to dismiss the Moores maintain that their
emotional distress stemmed in part from Ocwen's RESPA violations.
See, e.g., Pls.' Objection to Morgan Stanley Mot. to Dismiss
(document no. 72) at 7-8, ¶ 24.

(11th Cir. 2010) ("[P]laintiffs . . . may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA.").

The court acknowledges that some courts have reached a different conclusion. See Ramanujam v. Reunion Mortg., Inc., No. 09-cv-3030-JF, 2011 WL 446047, *5 (N.D. Cal. Feb. 3, 2011); In re Tomasevic, 273 B.R. 682, 687 (M.D. Fla. 2002); Katz v. Dime Sav. Bank, FSB, 992 F. Supp. 250, 255-56 (W.D.N.Y. 1997). That result, however, is at odds with both RESPA's plain language, allowing for recovery of "any actual damages," see, e.g., Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 218-20 (2008) (noting that the use of "any" suggests "a broad meaning"), and with its status as a consumer protection statute, see Barnes, 370 F.3d at 171. Interpreting RESPA to permit recovery for emotional distress, moreover, is in accord with decisions from the courts of this circuit interpreting the term "actual damages" as it appears in other remedial statutes. See, e.g., Fleet Mortg. Group, Inc. v. Kaneb, 196 F.3d 265, 269-70 (1st Cir. 1999) (concluding that "emotional damages qualify as 'actual damages'" under automatic stay provision of Bankruptcy Code); Sweetland v. Stevens & James, Inc., 563 F. Supp. 2d 300, 303-04 (D. Me. 2008) (interpreting term "actual damage" in Fair Debt Collection Practices Act to

24

encompass emotional damages).  Ocwen's motion to dismiss this count is therefore denied.

> **E.**   *Counts 5 and 6 - Fair Debt Collection Practices Act and New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act*

In Counts 5 and 6 of their complaint, the Moores seek to recover from Ocwen and Harmon for alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and its state-law analog, the New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act ("UDUCPA"), N.H. Rev. Stat. Ann. § 358-C.  Both statutes prohibit a broad range of conduct by debt collectors.  Under the FDCPA, for example, a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, and "may not use unfair or unconscionable means to collect or attempt to collect any debt," id. § 1692f.  The UDUCPA similarly prohibits debt collectors from "collect[ing] or attempt[ing] to collect a debt in an unfair, deceptive or unreasonable manner as defined in this chapter."  N.H. Rev. Stat. Ann. § 358-C:2.  Both statutes supplement these general prohibitions with more specific prohibitions.  See generally 15 U.S.C. §§ 1692b-1692j; N.H. Rev. Stat. Ann. § 358-C:3.  An aggrieved plaintiff may recover actual

or statutory damages under both statutes.  15 U.S.C. § 1692k(a);
N.H. Rev. Stat. Ann. § 358-C:4.

Ocwen has not argued that these claims should be dismissed
for any reason other than res judicata, which, as discussed in
Part III.A supra, is unavailing.  Harmon, on the other hand,
argues that both claims should be dismissed because it was not
engaged in the collection of a debt during its interactions with
the Moores, a necessary prerequisite to their recovery.  Harmon
also argues that the UDUCPA claim should be dismissed because the
Moores have failed to plead adequate facts in support of that
claim.  While Harmon's first argument fails because the complaint
and supporting documents support a plausible inference that
Harmon was engaged in debt collection, its second argument
succeeds because the Moores have not pleaded facts sufficient to
show that Harmon engaged in any conduct that violated the UDUCPA.
Thus, while the Moores' claim against Harmon under the FDCPA may
proceed, their UDUCPA claim against Harmon is dismissed.

### 1.  Debt collection

To recover under either the FDCPA or the UDUCPA, the Moores
must show that:  "(1) they have been the object of collection
activity arising from a consumer debt; (2) the defendant
attempting to collect the debt qualifies as a 'debt collector'
under the Act; and (3) the defendant has engaged in a prohibited

act or has failed to perform a requirement imposed by the [Act]."
Beadle v. Haughey, 2005 DNH 016, at 7; see also, e.g., Gilroy v.
Ameriquest Mortg. Co., 632 F. Supp. 2d 132, 134-37 (D.N.H. 2009).
Harmon argues that the first of these elements is missing because
it was not engaged in collection activity, but, in prosecuting a
foreclosure against the Moores, "instead was enforcing its
client's security interest."

This argument is contrary to Harmon's own communications
with the Moores.  In its initial letter on July 27, 2009, Harmon
informed them that their note had been accelerated "and the
entire balance [of $493,555.36] is due and payable forthwith and
without further notice."[9]  That letter further informed the
Moores that they could reinstate the loan by paying enough to
bring the loan current, that they could call Harmon or visit its
website to order a reinstatement or payoff, and that they had the
right to dispute the validity of the debt.  From these statements
alone it is evident that the purpose of Harmon's letter was not
only to enforce a security interest, but also to attempt to
collect the underlying loan debt.

---

[9]The court may consider this letter, which is expressly
referenced in the complaint and forms part of the basis for the
Moores' claims, without converting the motion to dismiss into a
motion for summary judgment.  Giragosian v. Ryan, 547 F.3d 59, 65
(1st Cir. 2008).

Even more damaging to Harmon's argument, though, are the letter's repeated references to Harmon's "efforts (through litigation or otherwise) to collect the debt," which obliterate the distinction Harmon now attempts to draw between collecting a debt and enforcing a security instrument.  Moreover, in bold, capital letters below the signature block, the letter states: "PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."  For Harmon now to argue that it was not engaged in debt collection is, to put it charitably, unsupportable.  Cf. Pettway v. Harmon Law Offices, P.C., No. 03-cv-10932-RGS, 2005 WL 2365331, *5 & n.10 (D. Mass. Sept. 27, 2005) (citing the selfsame debt collection language as grounds for concluding that Harmon was engaged in collection activity); In re Maxwell, 281 B.R. 101, 119 (Bkrtcy. D. Mass. 2002) (rejecting defendant's argument that it was not a debt collector because it sent plaintiff letters "in which it represented to her that it was acting as a debt collector under the FDCPA").[10]

At the very least, then, Harmon's actions in relation to the July 27 letter constituted collection activity subject to the

---

[10]Given the dearth of case law on the UDUCPA, these FDCPA cases are also useful in interpreting the UDUCPA "because [the FDCPA] contains provisions similar to the [UDUCPA]."  Gilroy, 632 F. Supp. 2d at 136.

FDCPA and the UDUCPA.  It is not clear from the complaint whether
Harmon's other communications with the Moores were intended to
encourage the Moores to pay their loan debt or were solely a part
of the foreclosure process.  But even assuming that Harmon is
correct that foreclosure does not constitute collection
activity,[11] the July 27 letter--which also informed the Moores
that Harmon had been retained to foreclose on their mortgage--
supports a plausible inference that Harmon's foreclosure
activities were at least intermingled (if not coextensive) with
its more mainstream collection activities.  Without further
factual development, the Court is not able to conclude as a
matter of law that Harmon's foreclosure-related activities were
not subject to the FDCPA and the UDUCPA.  See Pettway, 2005 WL
2365331 at *5 ("[A] defendant law firm whose foreclosure

---

[11]There is some support for Harmon's position, see, e.g.,
Beadle, 2005 DNH 016, at 7-12 (McAuliffe, J.) (concluding that
attorneys who conducted foreclosure proceedings were not subject
to FDCPA); see also Speleos v. BAC Home Loans Servicing, LP, No.
10-cv-11503-NMG, 2011 WL 4899982, *5-6 (D. Mass. Oct. 14, 2011)
(same), but the case law is not uniform on this point.  One court
of appeals has held that the FDCPA may apply to efforts to recoup
a debt through foreclosure, expressing concern that to hold
otherwise "would create an enormous loophole in the Act
immunizing any debt from coverage if that debt happened to be
secured by a real property interest and foreclosure proceedings
were used to collect the debt."  Wilson v. Draper & Goldberg,
P.L.L.C., 443 F.3d 373, 376 (4th Cir. 2006); cf. also Piper v.
Portnoff Law Assocs., Ltd., 396 F.3d 227, 235 (3d Cir. 2005)
("[T]he text of the FDCPA evidences a Congressional intent to
extend the protection of the Act to consumer defendants in suits
brought to enforce liens.").

activities are beyond reproach might nonetheless be liable under the FDCPA for related but less salubrious efforts to squeeze a debtor into coughing up the underlying debt."). Neither claim can be dismissed on this basis.

### 2. UDUCPA violation

Harmon also argues that, even if it was engaged in collection activity, the Moores have not adequately pleaded a UDUCPA violation. (It has not made a similar argument as to their FDCPA claim.) As just discussed, the UDUCPA bars a debt collector from "collect[ing] or attempt[ing] to collect a debt in an unfair, deceptive or unreasonable manner as defined in this chapter." N.H. Rev. Stat. Ann. § 358-C:2. The Moores allege that Harmon violated this command in that it (a) "made materially false representations as to the status of foreclosure proceedings when [it] initially claimed to represent Saxon"; (b) "knew or should have known that the lack of chain of title would prevent [it] from foreclosing on the property; and (c) "willfully withheld the truth from the Plaintiffs in connection with the status, collection status, and foreclosure status of their loan." Third Am. Compl. (document no. 47) at ¶¶ 106-07. But even assuming that any of these acts, if proven, could support recovery under the UDUCPA, the Moores have failed to allege facts to support them.

First, the Moores' blanket allegation that Harmon made materially false representations as to the status of foreclosure when it represented Saxon is unsupported by any facts pleaded in the complaint.  As alleged in the complaint, Harmon's only communications with the Moores while it represented Saxon were two letters sent in July 2009, and the only representation Harmon made in those letters regarding foreclosure was that it had been retained by Saxon to foreclose on the Moores' mortgage.  The Moores have not alleged that this statement was false, and the remaining allegations in the complaint provide no basis for plausibly concluding that it was.  Without factual support, the Moores' allegation, which tracks the statutory language, is simply a "formulaic recitation of the elements of a cause of action" that cannot serve as the basis for the UDUCPA claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Second, the Moores' allegation that Harmon "knew or should have known" that there was not a chain of title that would allow it to foreclose on the mortgage is similarly unsupported by any factual allegations.  In its July 2009 letters, Harmon informed the Moores that it had been retained to foreclose on a mortgage held by MERS--which at that time was the mortgagee of record. When Harmon next contacted the Moores regarding foreclosure, on February 20, 2010, it purported to represent Deutsche Bank--MERS'

31

successor as mortgagee by virtue of an assignment filed with the registry of deeds two days before.  While the Moores raise questions about the validity of that assignment in their complaint, they allege no facts suggesting that Harmon should have doubted its ability to foreclose on behalf of Deutsche Bank, the mortgagee of record.  The Moores have not pleaded facts to nudge this theory "across the line from conceivable to plausible," Twombly, 550 U.S. at 570, and it cannot support their UDUCPA claim, either.

Third, the Moores' claim that Harmon "willfully withheld the truth" regarding "the status, collection status, and foreclosure status" of their loan is likewise unsupported by any factual allegations.  The court must confess some confusion as to what "truth" Harmon supposedly withheld.  Nowhere in the complaint do the Moores plead any facts suggesting that Harmon did not candidly communicate with them regarding the collection of their debt or foreclosure on their mortgage.  As with the Moores' other theories under the UDUCPA, in the absence of factual support this allegation does not state a plausible claim to relief.  Because the Moores have not pleaded any factual basis for holding Harmon liable under the UDUCPA, Harmon's motion to dismiss is granted as to Count 6.

**F.   *Count 7 – Covenant of Good Faith and Fair Dealing***

Count 7 of the complaint makes a claim against all defendants for an alleged breach of the implied covenant of good faith and fair dealing.  "In every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another." Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192, 198 (2010).  Under New Hampshire law, this duty can be subdivided "into three general categories:  (1) contract formation; (2) termination of at-will employment agreements; and (3) limitation of discretion in contractual performance." Id. Here, the Moores appear to be asserting a claim based upon the third category.  "While the third category is comparatively narrow, its broader function is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations as well as with common standards of decency, fairness and reasonableness." Id.

The defendants have moved to dismiss this claim.  Those defendants who did not contract with the Moores argue that the Moores may not recover for a breach of the implied covenant from them, while those defendants who did contract with the Moores argue that the Moores have pleaded no facts establishing any behavior that breaches the covenant.  The court will address

these arguments, both of which are correct and require dismissal
of this claim as to all defendants, in turn.

### 1.   Lack of contractual relationship

A necessary prerequisite to a claim for breach of the
implied covenant of good faith and fair dealing is a contract
between the parties.  "New Hampshire law has not recognized a
claim for breach of the implied covenant of good faith and fair
dealing outside of the contractual context." J&M Lumber and
Constr. Co., Inc. v. Smyjunas, 161 N.H. 714, 724 (2011).  Of the
eight defendants in this case, the Moores have not pleaded the
existence of a contract with three:  Saxon, Ocwen, or Harmon.[12]
Although Saxon and Ocwen allegedly serviced the Moores' mortgage
on behalf of its holders, they were not themselves parties to the
mortgage (or any of the other loan documents) and cannot be held
liable for breach of any implied covenant included in that
contract.  See Vega v. Amer. Home Mortg. Servicing, Inc., No. CV-
10-02087, 2011 WL 2457398, *3 (D. Ariz. June 20, 2011)
(dismissing claim for breach of implied covenant against loan
servicer because servicer was not party to mortgage); Lomboy v.
SCME Mortg. Brokers, No. C-09-1160 SC, 2009 WL 1457738, *5 (N.D.

---

[12]Deutsche Bank and one of the Morgan Stanley defendants,
Morgan Stanley ABS Capital I Holding Corp., also argue that the
Moores did not allege a contract with either of them.  The
complaint alleges, however, that at various relevant times both
defendants owned or purported to own the Moores' mortgage.

Cal. May 26, 2009) (same).  In the absence of a contractual
relationship, the Moores' claim against these defendants for
breach of the implied covenant must be dismissed.

The Moores seek to avoid this result as to Saxon and Ocwen
by arguing that they breached the implied covenant inherent in
their HAMP Servicer Participation Agreements ("SPAs") with the
federal government.  In order to recover for a breach of the
implied covenants inherent in the SPAs, to which they are not
parties, the Moores must demonstrate that they are the intended
third-party beneficiaries of those agreements.  See Numerica Sav.
Bank, F.S.B. v. Mountain Lodge Inn, Corp., 134 N.H. 505, 513
(1991).  They cannot do so.

The court looks to federal law in considering whether a
plaintiff is an intended third-party beneficiary of a contract to
which the United States is a party.  Speleos v. BAC Home Loans
Servicing, LP, 755 F. Supp. 2d 304, 307 (D. Mass. 2010).  As our
court of appeals has explained:

> [T]he crux in third-party beneficiary analysis is the
> intent of the parties.  Because third-party beneficiary
> status constitutes an exception to the general rule
> that a contract does not grant enforceable rights to
> nonsignatories, a person aspiring to such status must
> show with special clarity that the contracting parties
> intended to confer a benefit on him.

McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994) (citations
and alterations omitted).  Moreover, federal courts in this

circuit have applied a presumption that parties who benefit from a government contract are incidental, rather than intended, beneficiaries, and "may not enforce the contract absent a clear intent to the contrary." Teixeira v. Fed. Nat'l Mortg. Ass'n, No. 10-11640-GAO, 2011 WL 3101811, *2 (D. Mass. July 18, 2011); see also In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig., No. 10-md-2193-RWZ, 2011 WL 2637222, *3 (D. Mass. July 6, 2011); Nash v. GMAC Mortg., LLC, No. 10-cv-493, 2011 WL 2470645, *7 & n.9 (D.R.I. May 18, 2011).  Here, the SPAs do not contain any provisions evincing a "clear intent" that borrowers may enforce them, and in fact contain provisions supporting the contrary conclusion.[13]  Indeed, § 11E of each SPA provides that it "shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest," as opposed to any other party.  A number of courts have found this language incompatible with an intent to bestow enforceable rights upon nonparties.  See Teixeira, 2011 WL 3101811 at *2 (noting that this language "appears to limit who can enforce the contract's terms"); In re Bank of America, 2011

---

[13]Again, because the SPAs are expressly referenced in the complaint and form part of the basis for the Moores' claims, the court may consider them in ruling on this motion to dismiss.  See supra n.6.  Both SPAs are also posted for public review at the Treasury Department's website:  Saxon's SPA is available at http://tinyurl.com/SaxonSPA (last visited Jan. 23, 2012); Ocwen's at http://tinyurl.com/OcwenSPA (last visited Jan. 23, 2012).

WL 2637222 at *3 (noting that this language does not "suggest[] any intent, let alone a 'clear intent,'" to benefit borrowers and in fact "compel[s] the opposite conclusion"); Alpino v. JPMorgan Chase Bank, Nat'l Ass'n, No. 10-cv-12040-PBS, 2011 WL 1564114, *4 (D. Mass. Apr. 21, 2011) (identifying this as "clear language limiting the class of actors who can enforce [the SPA's] terms").

The conclusion that the parties to the SPAs did not intend third parties to be able to enforce them finds additional support in § 7 of each contract, which provides a means of resolving any disputes that may arise under the SPAs—but between "Fannie Mae and Servicer" (i.e., Saxon or Ocwen) only. See Allen v. CitiMortgage, Inc., No. CCB-10-2740, 2011 WL 3425665, *7 (D. Md. Aug. 4, 2011) (relying in part on this language in determining that borrowers may not enforce SPA). That same section allows legal action only after the parties have taken "all reasonable steps to resolve disputes internally." Permitting third-party suits to enforce the implied covenant inherent in the SPAs would lead to the incongruous result that the actual parties to the SPAs would be required to attempt to resolve disputes out of court before filing suit, whereas third parties like the Moores would face no such obstacle.

The Moores do not point to any other provision of the SPAs, or allege any other facts, plausibly suggesting that they are

among the intended third-party beneficiaries of those agreements. Accordingly, the Moores have failed to state a claim for breach of the covenant of good faith and fair dealing under those agreements.[14]   Count 7 is dismissed as to Saxon, Ocwen, and Harmon.

### 2.   Breach of the covenant

The remaining defendants, who are alleged to be current or former holders of the Moores' mortgage, argue that the Moores have failed to plead facts plausibly suggesting that any of them breached the implied covenant inherent in the mortgage.  As noted previously, the Moores premise their claim upon the third variant of the implied covenant:  "limitation of discretion in contractual performance."  Birch Broad., 161 N.H. at 198. Because the Moores have pleaded the existence of a contract between themselves and the remaining defendants, whether they have sufficiently alleged a breach turns on three key questions: (1) "whether the agreement allows or confers discretion on the defendant to deprive the plaintiff of a substantial portion of the benefit of the agreement"; (2) "whether the defendant exercised its discretion reasonably"; and (3) "whether the

---

[14]In so holding, the court joins the overwhelming majority of courts to have considered whether borrowers are the intended third-party beneficiaries of SPAs.  See Alpino, 2011 WL 1564114 at *3; Speleos, 755 F. Supp. 2d at 308.

defendant's abuse of discretion caused the damage complained of."
Scott v. First Am. Title Ins. Co., 2007 DNH 007, at 14 (citing
Ahrendt v. Granite Bank, 144 N.H. 308, 312-13 (1999)).

Answering these questions in the present case is complicated
by the fact that the Moores' complaint and memoranda do not
identify any particular grant of discretion in the mortgage that
they believe was exercised unreasonably.  The court notes,
however, that the mortgage does confer some discretion on the
mortgagee as to acceleration and foreclosure, providing that the
"lender at its option may require immediate payment in full of
all sums secured by this Security Instrument without further
demand and may invoke the STATUTORY POWER OF SALE and any other
remedies permitted by Applicable Law."  Even assuming this is the
grant of discretion upon which the Moores wish to premise this
claim, neither the complaint nor the Moores' memoranda articulate
how that discretion was exercised unreasonably, so as to
frustrate the parties' agreed-upon common purpose, justified
expectations, or common standards of decency.  As the New
Hampshire Supreme Court has observed, "parties generally are
bound by the terms of an agreement freely and openly entered
into," and the implied covenant does not preclude a contracting
party from insisting on enforcement of the contract by its terms,
even when enforcement "might operate harshly or inequitably."

Olbres v. Hampton Co-op. Bank, 142 N.H. 227, 233 (1997).
Therefore, the mere fact that some or all of the defendants
exercised their contractual right to foreclose on the Moores
after they defaulted on their mortgage payments does not amount
to a breach of the implied covenant. See, e.g., Davenport v.
Litton Loan Servicing, LP, 725 F. Supp. 2d 862, 884 (N.D. Cal.
2010) ("As a general matter, a court should not conclude that a
foreclosure conducted in accordance with the terms of a deed of
trust constitutes a breach of the implied covenant of good faith
and fair dealing."); cf. Olbres, 142 N.H. at 233 (ruling that
lender did not breach implied covenant in note by exercising its
right to set off debt against borrower's deposit account).

The Moores also suggest that the defendants breached the
covenant of good faith and fair dealing by refusing to modify the
mortgage, or to engage in good-faith negotiations regarding
modification. Courts have generally concluded, however, that the
covenant of good faith and fair dealing in a loan agreement
cannot be used to require the lender to modify or restructure the
loan. See, e.g., FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d
93, 100-01 (1st Cir. 2009) (applying Massachusetts law); Rosemont
Gardens Funeral Chapel-Cemetary, Inc. v. Trustmark Nat'l Bank,
330 F. Supp. 2d 801, 810-11 (S.D. Miss. 2004) (collecting cases).
These decisions are consistent with New Hampshire law that the

40

applied covenant cannot be used to rewrite a contract to avoid harsh results.  See Olbres, 142 N.H. at 233.  The court sees no reason to believe that the New Hampshire Supreme Court would nevertheless allow the implied covenant to be used to require the parties here to rewrite their contract.

Because the Moores have failed to state a claim for breach of the implied covenant of good faith and fair dealing by any of the alleged holders of their mortgage, Count 7 is dismissed as to those defendants as well.

### G.   *Count 8 - Fraud*

In Count 8 of their complaint, brought against Saxon, Ocwen, MERS, Harmon, and WMC, the Moores make claims for three different variants of common-law fraud:  "origination fraud" by WMC; "loan modification" fraud by Saxon and Ocwen; and "assignments of mortgage" fraud by MERS and Ocwen.  Before proceeding to the specifics of each theory, the court notes that although Harmon is identified as a defendant under the general heading for Count 8, there are no allegations as to any fraudulent conduct by Harmon within Count 8.  As already discussed in Part III.E.2 supra, the Moores' claims of fraudulent conduct by Harmon elsewhere in the complaint are unsupported by any factual allegations.  Count 8 is therefore dismissed as to Harmon.  In addition, as discussed in Part III.C supra, the Moores' claim for "origination fraud" by

41

WMC is barred by the applicable statute of limitations, so the court need not decide whether the complaint nevertheless states such a claim.

### 1.   "Loan modification" fraud

The Moores' claims of "loan modification" fraud against Saxon and Ocwen assert that:  both defendants said that they were considering the Moores for a loan modification; these statements were false; and Saxon and Ocwen knew or should have known that they were false.  In reliance on these statements, the Moores say, they wasted their time, resources, and finances in pursuit of a modification.  Saxon and Ocwen argue that the Moores have failed to plead fraud in accordance with the heightened standard of Federal Rule of Civil Procedure 9(b).

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "This means that a complaint rooted in fraud must specify the who, what, where, and when of the allegedly false or fraudulent representations." Clearview Software v. Ware, No. 07-cv-405-JL, 2009 WL 2151017, *1 (D.N.H. July 15, 2009) (citing cases).  Saxon and Ocwen argue that, despite this requirement, the Moores have not identified:  "(i) which defendants made [the] representations and specifically the person that made such representations, (ii) specifically when

42

such representations were made, (iii) how such representations were false, and (iv) how the Moores relied upon them to their detriment." But the Moores do specify the dates of the alleged misstatements, as well as which defendant made them, and the remaining deficiencies do not require dismissal of this claim.

The Moores allege that on May 26, 2009, Saxon sent them a letter stating that its goal was to "help keep [them] in [their] home" and encouraging them to contact a "Home Preservation Specialist." Third Am. Compl. (document no. 47) ¶ 37. They further allege that Ocwen sent them a similar letter on November 20, 2009, which also informed them that the review process for a modification would take "up to" 30 days. Id. ¶ 46. These allegations are sufficiently specific as to who made the false statements and when--under the circumstances, it is not necessary for the Moores to identify the particular employee of each defendant who allegedly signed or authorized the letters. See Gilmore v. Sw. Bell Mobile Sys., L.L.C., 210 F.R.D. 212, 224 (N.D. Ill. 2001) ("Where there is a single corporate defendant and the misrepresentations are sent in mass mailings that do not themselves identify the author of the document, it is not required that the allegations identify the specific person or persons at the corporate defendant who authored the document or were responsible for the document's contents."); Vista Co. v.

43

Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1302 (S.D.N.Y. 1989) ("Plaintiffs are not required to recite the precise statement which the specific individual in the defendant corporation made on a particular date.").

The other allegations in the complaint make clear that the Moores claim these statements were false in that neither Saxon nor Ocwen intended to consider them for a modification in good faith, and that the Moores detrimentally relied on these statements by spending time, money, and effort on ultimately unsuccessful loan modification discussions. In any event, Rule 9(b)'s heightened pleading requirement "extends only to the particulars of the allegedly misleading statement itself. The other elements of fraud . . . may be averred in general terms." Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004). The Moores' claim against Saxon and Ocwen for fraud in the loan modification process may therefore proceed.

### 2. "Assignments of mortgage" fraud

The Moores' claim for "assignments of mortgage" fraud against Ocwen and MERS rests on the notion that the assignment of their mortgage from MERS to Deutsche Bank was fraudulent because the individual who signed the assignment on behalf of MERS, Juan Pardo, was not an employee of MERS at all, but of Ocwen. Ocwen and MERS argue that, even if Pardo did falsely state in the

assignment that he was a MERS employee, this misstatement did not cause any harm to the Moores that can be recovered under a fraud theory.  The court agrees.

Under New Hampshire law, a plaintiff can recover in fraud only for "pecuniary loss caused to [it] by [its] justifiable reliance upon the misrepresentation." Gray v. First NH Banks, 138 N.H. 279, 283 (1994) (quoting Restatement (Second) of Torts § 525 (1976)).  The Moores do not claim to have relied upon Pardo's alleged misrepresentation that he worked for MERS.  Instead, they seem to suggest that it was Deutsche Bank who relied on that statement, by accepting the assignment--and that, had this not occurred, Deutsche Bank never would have attempted to foreclose on their mortgage.  But a plaintiff does not state a claim for fraud against the maker of a fraudulent statement when that statement was relied upon solely by others, even if that reliance forms a link in a chain of events that ends up causing harm to the plaintiff.  See, e.g., Restatement (Second) of Torts § 537 cmt. a (1977).  The Moores' theory of "assignment fraud," then, fails to state a claim against Ocwen or MERS,[15] and is dismissed.

---

[15]The apparent absurdity of the Moores' attempt to sue MERS for an allegedly fraudulent transfer of its own interest in the mortgage has not escaped the court's attention.  The parties did not address this issue in their memoranda, though, so the court does not address it here.

**H.**   ***Counts 9 and 11 - Fraud in the inducement and Intentional and negligent misrepresentation***

Count 9 of the Moores' complaint seeks to recover from Saxon and Ocwen for fraud in the inducement, while Count 11 makes claims against all defendants for intentional and negligent misrepresentation.  These claims are also subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  As noted in Part III.G.1 <u>supra</u>, to satisfy this standard the Moores "must specify the who, what, where, and when of the allegedly false or fraudulent representations." Clearview Software, 2009 WL 2151017 at *1.

Except with respect to their allegations against Saxon and Ocwen, the complaint's allegations of misrepresentations by the defendants are not pleaded with sufficient specificity.  Indeed, the Moores do not identify any particular false statements by any of these other defendants.  Accordingly, the Moores' misrepresentation claims against those defendants in Count 11 must be dismissed.  Their claims against Saxon and Ocwen in Count 11 may proceed, though.  As discussed in Part III.G.1 <u>supra</u>, the Moores' allegations of misrepresentations by these two defendants are pleaded with sufficient specificity.

The Moores' claims for fraud in the inducement against Saxon and Ocwen, however, must be dismissed.  A cause of action for fraud in the inducement lies where one party has "procur[ed]

46

. . . a contract or conveyance by means of fraud or negligent misrepresentation." Van Der Stok v. Van Voorhees, 151 N.H. 679, 681 (2005). But the Moores do not allege that either Saxon or Ocwen induced them to enter into a contract or conveyance through fraud. Instead, they premise this claim on the same conduct that underlies their claims against Saxon and Ocwen for "loan modification fraud" in Count 8 and intentional and negligent misrepresentation in Count 11, i.e., those defendants' representations regarding the modification status of their loan. While those allegations state claims for fraud and intentional and negligent misrepresentation against Saxon and Ocwen, they fail to state a claim for fraud in the inducement. Count 9 is therefore dismissed.

### I.   *Counts 10, 12, and 13 - Duty-based claims*

Counts 10, 12, and 13 of the complaint each make claims that, to succeed, require the existence of some duty from the defendants to the Moores. Count 10 makes a straightforward negligence claim; Count 12, a claim for breach of assumed duty; and Count 13, a claim for breach of fiduciary duty.[16] In their motions to dismiss, the defendants each argue that they had no

---

[16]Claims for negligence--like claims for breach of an assumed duty or a fiduciary duty--"rest primarily upon a violation of some duty owed by the offender to the injured party." Ahrendt v. Granite Bank, 144 N.H. 308, 314 (1999).

duty to the Moores, and that in the absence of a duty, the claims against them in these counts must be dismissed.  While the Moores counter that each of the defendants owed them a generalized "duty to act with reasonable care," the allegations of the complaint do not plausibly establish the existence of any such duty.  These counts must accordingly be dismissed.

Citing a bankruptcy case applying Massachusetts law, defendants argue that "a lender owes no general duty of care to a borrower."  See, e.g., Deutsche Bank Mot. to Dismiss (document no. 71) at 10 (citing In re Fordham, 130 B.R. 632, 646 (Bankr. D. Mass. 1991)).  The court does not adopt the defendants' position wholesale.  Even if this is an accurate statement of Massachusetts law, it does not necessarily reflect the law of New Hampshire.  It is true that, under New Hampshire law, the relationship between a lender and borrower is contractual in nature, Ahrendt v. Granite Bank, 144 N.H. 308, 311 (1999), and that the existence of such a contractual relationship typically prohibits recovery in tort, see Wyle v. Lees, 162 N.H. 406, 2011 WL 4390732, *2 (N.H. Sept. 20, 2011).  But New Hampshire law also recognizes that a contracting party may be "owed an independent duty of care outside the terms of the contract."  Id. at *3.  Thus, the New Hampshire Supreme Court has concluded that a lender owes a borrower a duty not to disburse its loan funds without

48

authorization, Lash v. Cheshire Cnty. Sav. Bank, Inc., 124 N.H. 435, 438-39 (1984), and that a mortgagee, in its role as seller at a foreclosure sale, owes a duty to the mortgagor "to obtain a fair and reasonable price under the circumstances." Murphy v. Fin. Dev. Corp., 126 N.H. 536, 541 (1985).

Where the existence of such a duty is claimed, though, "[t]he burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender." Seymour v. N.H. Sav. Bank, 131 N.H. 753, 759 (1989). As to the mortgagees, note-holders, and their loan servicers named as defendants here--MERS, Saxon, Ocwen, Deutsche Bank, and the Morgan Stanley Defendants--the Moores have not alleged facts demonstrating that any of them did so. Rather, the acts alleged in the complaint relate entirely to those defendants' attempts to collect the Moores' mortgage debt and to recoup their investment through foreclosure, both of which fall squarely within the normal role of a lender. Though the Moores assert that Ocwen and Saxon undertook additional duties when they entered into their HAMP SPAs with the federal government, this argument runs afoul of at least two principles of contract law: first, that third parties may not enforce a contract absent a clear intent to the contrary, see Part III.F.1 supra, and second, that harmed parties

may not pursue tort claims for contractual breaches, see Wyle, 2011 WL 4390732 at *2-3.  The Moores may not, therefore, premise a negligence claim upon an alleged breach of the HAMP SPAs.

The Moores' claims against Harmon, which pursued the foreclosure against the Moores on behalf of the other defendants, also fail for lack of an alleged, apparent, or implied duty.  The New Hampshire Supreme Court has expressly "decline[d] to impose on an attorney a duty of care to a non-client whose interests are adverse to those of a client." MacMillan v. Scheffy, 147 N.H. 362, 365 (2001).  In so holding, the court noted that "the existence of a duty of the attorney to another person would interfere with the undivided loyalty which the attorney owes his client and would detract from achieving the most advantageous position for his client." Id.

Accordingly, because the complaint does not support the existence of a duty owed by any of the defendants to the Moores outside the terms of their contracts,[17] Counts 10, 12, and 13 are dismissed.

---

[17]It is worth noting here that New Hampshire does not permit an action for negligence to be premised upon the violation of a duty imposed by statute unless a similar duty existed at common law. Stillwater Condo. Ass'n v. Town of Salem, 140 N.H. 505, 507 (1995).  The Moores have not argued that their negligence claims are premised on alleged RESPA, FDCPA, or UDUCPA violations, so the court need not address whether the duties imposed by those statutes existed at common law so as to permit a negligence claim against any of the defendants.

### J.   *Count 14 - Civil conspiracy*

Count 14 of the Moores' complaint makes a claim against all defendants for civil conspiracy.  New Hampshire courts define civil conspiracy as "a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means."  Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987) (quoting 15A C.J.S. Conspiracy § 1(1), at 596 (1967)).  The elements of a cause of action for civil conspiracy are "(1) two or more persons (including corporations); (2) an object to be accomplished (i.e. an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  Id.  The Moores have failed to state such a claim because they have not adequately alleged the existence of an agreement between or among any of the defendants.

The Moores never squarely allege that the defendants agreed to undertake any joint course of action.  At most, they ask the court to infer that the defendants agreed to foreclose on their mortgage from the fact that the defendants all allegedly undertook wrongful acts in connection with the origination, servicing, and foreclosure of the Moores' mortgage.  This is akin

51

to the situation the Supreme Court confronted in Bell Atl. Corp.

v. Twombly, 550 U.S. 544 (2007).  There, the Court explained:

> [S]tating such a claim [for conspiracy] requires a
> complaint with enough factual matter (taken as true) to
> suggest that an agreement was made.  Asking for
> plausible grounds to infer an agreement does not impose
> a probability requirement at the pleading stage; it
> simply calls for enough fact to raise a reasonable
> expectation that discovery will reveal evidence of
> illegal agreement.  . . . [A]n allegation of parallel
> conduct and a bare assertion of conspiracy will not
> suffice.  Without more, parallel conduct does not
> suggest conspiracy, and a conclusory allegation of
> agreement at some unidentified point does not supply
> facts adequate to show illegality.  Hence, when
> allegations of parallel conduct are set out in order to
> make a [conspiracy] claim, they must be placed in a
> context that raises a suggestion of a preceding
> agreement, not merely parallel conduct that could just
> as well be independent action.

Id. at 556-57.  Thus, the mere fact that the defendants all took

actions directed at the Moores' mortgage does not permit the

court to infer an agreement on an object to be accomplished or

course of action.  Because the Moores have alleged no "plausible

grounds to infer an agreement," Count 14 must be dismissed.

### K.    *Count 15 - Negligent & intentional infliction of emotional distress*

In Count 15, the Moores make claims for negligent and

intentional infliction of emotional distress against all

defendants.  Among other things, the defendants argue that these

claims must be dismissed because damages for emotional distress

are not available in contract actions.  See Crowley v. Global

Realty, Inc., 124 N.H. 814, 817 (1984) ("[R]ecovery of damages for mental suffering and emotional distress is not generally permitted in actions arising out of breach of contract."). This argument is not persuasive because, as the Moores point out, the conduct alleged in this case is not limited to contractual violations, but includes tortious behavior and violations of several consumer protection statutes. The claims must nonetheless be dismissed for other reasons. Because negligent infliction of emotional distress (NIED) and intentional infliction of emotional distress (IIED) are two separate claims with different elements, the court addresses them separately.

### 1.   Negligent infliction of emotional distress

"The elements of a claim for negligent infliction of emotional distress include: (1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." Tessier v. Rockefeller, 162 N.H. 324, 2011 WL 4133840, *12 (N.H. Sept. 15, 2011). As already discussed above, see Part III.I supra, the Moores have not stated a claim for negligence against the defendants, and therefore cannot maintain a claim for NIED, either. Indeed, as this court recently observed, "a claim for NIED, like any other negligence claim, demands the existence of a

53

duty from the defendant to the plaintiff." BK v. N.H. Dep't of Health & Human Servs., -- F. Supp. 2d --, 2011 DNH 157, 29-30.

### 2.    Intentional infliction of emotional distress

"In order to make out a claim for intentional infliction of emotional distress, a plaintiff must allege that a defendant by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to another." Tessier, 2011 WL 4133840 at *11 (quotations and alterations omitted).  This is a "formidable standard."  Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 267 (D.N.H. 2009).  "[I]t is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." Tessier, 2011 WL 4133840 at *11.  Instead, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

The defendants argue that the conduct the Moores allege does not meet this high standard, and the court agrees.  Essentially, the Moores allege the following.  Both Saxon and Ocwen, after entering contracts with the federal government to modify mortgage loans, told the Moores--who had already defaulted on their

mortgage--that they were committed to helping them remain in their home.  Despite these representations, and in possible breach of their contracts with the federal government, Saxon and Ocwen made either weak or nonexistent efforts toward helping the Moores obtain a loan modification.  Ocwen promised to send the Moores modification application documents but never did so.  At different times, both Saxon and Ocwen retained Harmon to institute foreclosure proceedings or to collect the Moores' outstanding mortgage debt on behalf of the entity or entities that held the Moores' mortgage and note.  Both Ocwen and Harmon ignored or refused to respond to the Moores' letters, including requests for debt verification under the FDCPA and a qualified written request under RESPA.  And, after Ocwen told the Moores that it would not foreclose for three months, it scheduled a foreclosure sale on behalf of Deutsche Bank just a month later.

While, as described elsewhere in this order, some of this conduct may have been unlawful, the court cannot say that any of defendants' alleged actions, whether viewed individually or in conjunction with one another, "go beyond all possible bounds of decency," or are "atrocious and utterly intolerable in a civilized community."  Cf. Alpino v. JPMorgan Chase Bank, Nat'l Ass'n, No. 10-0679, 2011 WL 1564114, *8 (D. Mass. April 21, 2011) (dismissing claim for IIED where, "[a]t most, the defendant

failed to consider the plaintiff for a mortgage modification under HAMP and then failed to operate an open and fair foreclosure sale"); Davenport v. Litton Loan Servicing, LP, 725 F. Supp. 2d 862, 884 (N.D. Cal. 2010) (dismissing claim for IIED where servicer allegedly refused to negotiate refinance with plaintiff, did not comply with statutory requirements for foreclosure, and did not consider plaintiff for alternatives to foreclosure). This is not meant to minimize the consequences of the defendants' alleged actions: the court recognizes that "home foreclosure is a terrible event and likely to be fraught with unique emotions and angst." Davenport, 725 F. Supp. 2d at 884. But the defendants' actions cannot, as a matter of law, be called "utterly intolerable in a civilized community." The Moores' claim for IIED is dismissed.

### L.   *Count 16 - Promissory Estoppel*

Count 16 of the Moores' complaint makes a claim for promissory estoppel against Ocwen. Under the theory of promissory estoppel, "a promise reasonably understood as intended to induce action is enforceable by one who relies on it to his detriment or to the benefit of the promisor." Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 738 (1988) (citing Restatement (Second) of Contracts § 90 (1981)). The Moores allege that Ocwen's January 2010 "Reinstatement Quote," which informed them

that the "total amount due to reinstate" as of April 1, 2010 was
$79,151.46, constituted a promise "that no action would be taken
towards foreclosure" prior to April 1, 2010.  Third Am. Compl.
(document no. 47) at ¶ 178.  According to the Moores, Ocwen then
breached this promise on February 20, 2010, when it sent them two
Notices of Foreclosure Sale informing them that a sale had been
scheduled for March 18, 2010.  Ocwen argues that this claim must
be dismissed because, among other things, the Moores have not
alleged that they detrimentally relied upon the reinstatement
quote.  The court agrees.

    The Moores have not alleged any facts suggesting that,
insofar as the Reinstatement Quote was a promise to hold off on
foreclosing, they relied on this promise to their detriment or to
Ocwen's benefit.  There are simply no allegations in the
complaint that in the short time between when Ocwen made the
promise (in January 2010) and when it allegedly broke it (in
February 2010), the Moores did or forewent anything in reliance
on the Quote, detrimental to them, beneficial to Ocwen, or
otherwise.  The Moores have not stated a claim for promissory
estoppel.  Count 16 is dismissed.

    **M.    *Count 17 - Avoidance of note***

    Finally, Count 17 of the complaint makes a claim for
"avoidance of note" against "all defendants claiming to own the

57

note [and] mortgage."  In support of this claim, the Moores

allege that the defendants "have been unable or unwilling to

provide the Plaintiffs with evidence that they hold the original

of the Note or Mortgage," that "[a]ctual possession of the

original of the note is a necessary legal prerequisite to

enforcement of the Note," and that "[i]n the absence of an

ability to show that [they possess] the original of the Note"

none of the defendants "has a right to enforce the same."  Third

Am. Compl. (document no. 47) at ¶¶ 184-86.  While New Hampshire

courts have not recognized a cause of action for "avoidance of

note"[18] and a federal court sitting in diversity should not

"create new doctrines expanding state law," Bartlett v. Mut.

Pharm. Co., Inc., 2010 DNH 164, at 16, the court interprets this

cause of action as seeking a declaratory judgment that the

defendants may not enforce the note against the Moores.[19]  The

---

[18]In the only publicly available opinions that so much as
mention this cause of action--in New Hampshire or elsewhere--the
courts never reached the question of whether such a cause of
action exists because the plaintiff conceded that his claim for
avoidance of the note could not survive the defendants' motion to
dismiss.  See Dillon v. Select Portfolio Servicing, 630 F.3d 75,
83 (1st Cir. 2011); Dillon v. Select Portfolio Servicing, 2008
DNH 019, at 20.  The court observes that in typical legal usage,
"avoidance" refers to the power of a bankruptcy trustee under the
Bankruptcy Code to undo "some prebankruptcy transfers of the
debtor's property and most postbankruptcy transfers of estate
property."  1 David G. Epstein et al., Bankruptcy § 6-1, at 498
(1992).

[19]The court here reads the Moores' complaint with an extra
degree of solicitude.  See supra n.8.

only parties that have moved to dismiss this claim (and the only
parties who appear to "claim to own the note and mortgage") are
Deutsche Bank and the Morgan Stanley defendants.  They argue that
under New Hampshire law, they need not possess the Note in order
to foreclose on the mortgage.

Even if this argument is correct (and the court need not and
does not reach that issue at this time), it is beside the point.
On its face, Count 17 does not assert that defendants may not
enforce the mortgage by foreclosing, but that they may not
enforce the note--e.g., by attempting to collect the amount due
under it.  Under New Hampshire law, possession of a negotiable
instrument such as the note is (with limited exceptions not
invoked here) a prerequisite to its enforcement.  See N.H. Rev.
Stat. Ann. § 382-A:3-301.  As the Moores have sufficiently
alleged that the defendants do not possess the note, and it is
enforcement of the note which the Moores seek to avoid, the
motions to dismiss Count 17 are denied.

## IV.  **Conclusion**

For the reasons set forth above, WMC's motion to dismiss[20]
is GRANTED.  The remaining defendants' motions to dismiss[21] are

---

[20]Document no. 80.

[21]Documents nos. 52, 53, 54, 60, 70, and 71.

each GRANTED in part and DENIED in part.  Counts 1, 2, 3, 7, 9, 10, 12, 13, 14, 15, and 16 of the Third Amended Complaint are dismissed in their entirety.  Count 6 of the Third Amended Complaint is dismissed as to Harmon only; Count 8 as to WMC, MERS, and Harmon only; and Count 11 as to WMC, MERS, Harmon, Deutsche Bank, and the Morgan Stanley Defendants only.  The motions are denied as to all other counts.

Accordingly, counts 4 and 6 may proceed against Ocwen; count 5 against Ocwen and Harmon; counts 8 and 11 against Saxon and Ocwen; and count 17 against Deutsche Bank and the Morgan Stanley defendants.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 27, 2012

cc:  Angela Jo Moore (pro se)
     M. Porter Moore (pro se)
     Joshua D. Shakun, Esq.
     Brian S. Grossman, Esq.
     Peter G. Callaghan, Esq.
     Edmund J. Boutin, Esq.
     David A. Scheffel, Esq.
     Eric Epstein, Esq.