UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Angela Jo Moore and M. Porter
Moore

     v.                          Civil No. 10-cv-241-JL
                                          Opinion No. 2013 DNH 065
Mortgage Electronic Registration
Systems, Inc., et al.


**MEMORANDUM ORDER**

In this action, which alleges impropriety in the servicing of a mortgage loan, pro se plaintiffs Angela Jo and M. Porter Moore press six counts against the current and former servicers of their loan, foreclosure counsel, and a handful of entities claiming to hold their mortgage and associated note.[1]  The Moores seek damages for allegedly unlawful debt collection practices and fraud, and a declaration that the defendants can not enforce the note.  This court has diversity jurisdiction over this matter between the Moores, who are New Hampshire citizens, and the defendants, various out-of-state entities, under 28 U.S.C. § 1332 (diversity) since the amount in controversy exceeds $75,000.  The court also has jurisdiction under 28 U.S.C. § 1331 (federal

---

[1]The Moores' Third Amended Complaint contained seventeen counts.  On the defendants' motion, the court dismissed eleven.  See Moore v. Mortg. Elec. Registration Sys., Inc., 848 F. Supp. 2d 107 (D.N.H. 2012).

question) and 1367 (supplemental jurisdiction) by virtue of the Moores' claims under various federal statutes.

The defendants have filed three separate motions for summary judgment.  See Fed. R. Civ. P. 56.  After hearing oral argument, the court grants the motions.  As explained in more detail below, the Moores have not proffered admissible evidence creating a dispute of material fact as to any of their claims in this case, nor have they shown that a genuine dispute of material fact exists as to defendant Deutsche Bank National Trust Company's possession of (and, hence, right to enforce) their note.

## I.  **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most

favorable to the non-moving party."  Id.  The following facts are set forth accordingly.

## II.  **Background**

In late 2006, plaintiff Angela Jo Moore refinanced the mortgage on the Sandwich, New Hampshire home she shares with her husband, plaintiff M. Porter Moore, receiving a loan in the amount of $452,000 from WMC Mortgage Corporation.  Only Mrs. Moore signed the promissory note for the loan, but both Moores executed a mortgage granting a security interest in the property to Mortgage Electronic Registration Systems, Inc., or "MERS," as nominee for WMC.  Defendant Saxon Mortgage Services, Inc. began servicing the loan early the following year.

Mrs. Moore began to experience difficulty making her loan payments in 2008, and defaulted in October of that year; since then, she has made no payments on the loan.  Mrs. Moore's default prompted Saxon to retain defendant Harmon Law Offices to initiate foreclosure proceedings against the property.  It also prompted a flurry of exchanges between Saxon and the Moores regarding the possibility of a loan modification or other option to prevent foreclosure.  In August 2009, Saxon offered Mrs. Moore a trial modification under the federal government's Home Affordable Modification Program ("HAMP").  The Moores chose not to accept that offer.

Shortly thereafter, defendant Ocwen Loan Servicing LLC acquired the servicing rights to the loan.  Harmon continued to pursue foreclosure, on Ocwen's behalf.  Mrs. Moore wrote to Ocwen on December 7, 2009, not long after the transfer of servicing, requesting that it verify her debt and send her "ALL documentation regarding this matter."  Harmon responded, on Ocwen's behalf, within two months, enclosing a payment history of the Moores' account dating back to December 2007 and a reinstatement quote.  Apparently dissatisfied with this response, on March 23, 2010, Mrs. Moore sent Ocwen a second letter, which purported to be a "Qualified Written Request" under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 et seq., and requested "copies of all documents pertaining to the origination and servicing of the mortgage."  Ocwen did not acknowledge receipt of, or otherwise respond to, this letter.

On March 15, 2010, Ocwen contacted Mr. Moore by e-mail to inform him that a foreclosure sale was scheduled for March 18, 2010, and that the sale would not be postponed unless the Moores submitted an application for a HAMP modification.  The Moores did so, and the sale was postponed.  After reviewing the Moores' application, Ocwen noted that certain documents were missing and requested those documents by both mail and telephone.  The Moores

did not provide the requested documents, and, on June 7, 2010, their application was denied.

In the meantime--specifically, on February 4, 2010--MERS assigned the Moores' mortgage to Deutsche Bank National Trust Company, as trustee for a securitized mortgage trust. The assignment recited an effective date of November 16, 2009 (the same day Ocwen acquired the servicing rights from Saxon). At some point, Deutsche Bank also came into possession of the Moores' note, which bears an indorsement in blank signed by Alex Arguella, who purports to be an assistant secretary of WMC.

The Moores filed this action in Carroll County Superior Court on May 17, 2010, seeking to enjoin a foreclosure sale that, their original complaint alleged, was scheduled for May 20, 2010. The defendants removed to this court on June 21, 2010. No foreclosure has occurred, and the Moores continue to reside in the subject property.

## III. **Analysis**

As already mentioned, see supra n.1 & accompanying text, the Moores' Third Amended Complaint (hereinafter "complaint") originally contained seventeen counts, only six of which remain pending before the court. The remaining counts allege violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 et seq., the Fair Debt Collection Practices Act ("FDCPA"),

15 U.S.C. § 1692 et seq., and the New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act ("UDUCPA"), N.H. Rev. Stat. Ann. § 358-C; negligent misrepresentation; fraud; and "avoidance of note," which the court previously interpreted as seeking a declaratory judgment that the defendants may not enforce the promissory note against the Moores.  See Moore, 848 F. Supp. 2d at 136-37.  As discussed below, defendants have demonstrated that there is no genuine dispute as to any fact material to any of these claims, and their motions for summary judgment are granted in full.

### A.  *Real Estate Settlement Procedures Act*

Count 4 of the complaint, brought against Ocwen only, claims that Ocwen violated RESPA by failing to acknowledge receipt of, or otherwise respond to, the Moores' March 23, 2010 letter, which purported to be a "Qualified Written Request."[2]  See 12 U.S.C.

---

[2]Count 4 also alleges that Mrs. Moore's "December 07, 2009 letter to Ocwen was a clear Qualified Written Request" under RESPA, and that Ocwen's response to that letter violated RESPA. Third Am. Compl. (document no. 47) at 89.  Unsurprisingly, then, Ocwen's motion for summary judgment also addresses that letter. In their objection to Ocwen's motion, the Moores ridicule Ocwen for this, characterizing Ocwen's argument as "incoherent" and stating that "it's clear on its face that the December 7, 2009 letter was never intended to be a qualified written request but a request for debt verification."  Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 6.  The court interprets this change in the Moores' position as a waiver of any RESPA claim they might have based upon the December 7, 2009 letter, and analyzes Count 4 accordingly.

§ 2605(e).  Ocwen argues that it is entitled to summary judgment
on this count because (1) the letter was not, in fact, a
Qualified Written Request as defined in RESPA, (2) even if it
was, the Moores suffered no actual damages as a result of Ocwen's
violation, and (3) Mr. Moore cannot recover under RESPA because
he is not the borrower named in the note.  The second argument is
persuasive, and the court therefore need not address either of
Ocwen's alternative arguments.

In relevant part, RESPA requires the servicer of a
federally-related mortgage loan to acknowledge receipt of a
borrower's Qualified Written Request within 20 business days, id.
§ 2605(e)(1)(A), and to provide certain information to the
borrower within 60 business days, id. § 2605(e)(2).  If the
servicer fails to fulfill these obligations, it may be held
liable for "any actual damages to the borrower as a result of the
failure."[3]  Id. § 2605(f)(1)(A).  As this court explained in its
previous order on defendants' motions to dismiss, "actual
damages" within the meaning of this provision may include damages
for emotional distress, which the Moores identified in their
complaint as the only type of damages they suffered due to

---

[3]RESPA also permits recovery of statutory damages "in the
case of a pattern or practice of noncompliance." 12 U.S.C.
§ 2605(f)(1)(B).  That provision is not at play in this case.
See Moore, 848 F. Supp. 2d at 122.

Ocwen's alleged RESPA violations.  Moore, 848 F. Supp. 2d at 122-23.  To recover such damages, though, a plaintiff "must present specific evidence to establish a causal link between the financing institution's violation and their injuries."  McLean v. GMAC Mortg. Corp., 398 F. App'x 467, 471 (11th Cir. 2010).

Assuming without deciding that the March 23, 2010 letter was a Qualified Written Request, the Moores have proffered no evidence that they actually suffered emotional damages "as a result of" Ocwen's alleged failure to respond to that letter; indeed, Mr. Moore acknowledged at oral argument that they had no proof of any such damages.  The only damage Mrs. Moore identified in her deposition testimony was a gluten allergy she developed in May of 2009 due to stress.  This, however, was months prior to the alleged qualified written request and, indeed, before Ocwen even began servicing her loan.  Similarly, Mr. Moore testified that he began taking medication for stress, but this, again, occurred before Ocwen's acquisition of servicing rights.[4]
Neither plaintiff testified that these conditions were enhanced

---

[4]The Moores' discovery responses also claimed that they paid $15,000 in attorneys' fees due in part to Ocwen's noncompliance, but the Moores do not claim in their complaint or their objection that they can recover that amount as damages under RESPA.  In any event, "attorney's fees for bringing a RESPA suit are not actual damages under the statute."  Kassner v. Chase Home Fin., LLC, No. 11-cv-10643, 2012 WL 260392, *7 (D. Mass. Jan. 27, 2012) (citing cases).

or exacerbated by Ocwen's conduct.  Accordingly, they cannot
serve as the basis for the Moores' RESPA claim.  Cf. McDermott v.
Marcus, Errico, Emmer & Brooks, P.C., No. 09-cv-10159, 2012 WL
5878665, *49 (D. Mass. Nov. 20, 2012) (plaintiff could not
recover actual damages for emotional distress under consumer
protection statute where, among other things, "[h]e began taking
Valium and Paxil years before" defendant's non-compliance).  In
the absence of any evidence that the Moores suffered actual
damages as a result of Ocwen's alleged RESPA violations, summary
judgment is granted to Ocwen on Count 4.

    **B.**   ***Fair Debt Collection Practices Act***

Count 5 of the Moores' complaint seeks to recover from Ocwen
and Harmon for alleged violations of the FDCPA.  The Moores
allege that both defendants violated 15 U.S.C. §§ 1692e & 1692f--
which prohibit, respectively, using "false, deceptive, or
misleading representation[s] or means" and "unfair or
unconscionable means" while attempting to collect a debt.  See
Third Am. Compl. (document no. 47) ¶ 96.  They further allege
that Ocwen violated 15 U.S.C. § 1692g "by failing to properly
verify the debt, charging [the Moores] a fee for the information
and failing to cease any and all collection efforts once [they]
requested verification of [the] debt."  Id. ¶ 97.  Both
defendants have moved for summary judgment, arguing that the

undisputed material facts conclusively establish that they are
not liable for any of the alleged violations.  The court agrees.

### 1.   15 U.S.C. §§ 1692e & 1692f

As just mentioned, 15 U.S.C. §§ 1692e & 1692f prohibit a
debt collector's use of "false, deceptive, or misleading
representation[s] or means" and "unfair or unconscionable means."
There is no benefit to be had from reciting at length Ocwen's and
Harmon's various interactions with the Moores while those
defendants attempted to collect the Moores' mortgage debt.  It
suffices to say that the defendants have done so in their
memoranda in support of summary judgment, and that the facts
recited in those memoranda, which are supported by admissible
evidence and undisputed by the Moores, do not reveal any conduct
even remotely approaching "false, deceptive, or misleading" or
"unfair or unconscionable."

The Moores suggest that "the act of attempting to collect
(and then enforce through foreclosure) a debt not actually owed
to any of the parties seeking to collect on it . . . meets the
standard of, at a minimum, acting unfairly."  Pls.' Obj. to
Harmon Mot. for Summ. J. (document no. 128) at 4.  Even assuming
that is an accurate statement of law, it does not help the Moores
here, as they have presented no evidence whatsoever that could
enable a reasonable finder of fact to conclude that their debt

was "not actually owed to any of the parties" on whose behalf
Ocwen and Harmon were attempting to collect it.  While the Moores
assert that "[t]o date, none of the parties have proven they had
or have the right to enforce the Note,"[5] that turns the burden of
proof on its head:  the defendants are not required to prove that
they did not violate the FDCPA; rather, the Moores must prove
that they did.  And, as just discussed, they have identified no
evidence to that effect.

### 2.   15 U.S.C. § 1692g

The Moores' claim against Ocwen under 15 U.S.C. § 1692g,
though also ill-fated, requires somewhat more discussion.
Subsection (a) of this provision requires a debt collector,
"[w]ithin five days after the initial communication with a
consumer in connection with the collection of any debt," to send
the consumer a written notice containing certain information,
including a notice of the consumer's right to dispute the debt or
request other information within 30 days of receipt.  15 U.S.C.
§ 1692g(a).  Subsection (b) provides that if the consumer
disputes the debt or requests such information within that 30-day
period, "the debt collector shall cease collection of the debt,
or any disputed portion thereof," until it verifies the debt or
provides the requested information.  Id. § 1692g(b).

---

[5]But see infra Part II.E.

The court must confess some confusion as to which of these subsections serves as the basis of the Moores' § 1692g claim. The complaint's references to Ocwen "failing to properly verify the debt" and "failing to cease any and all collection efforts once [the Moores] requested verification of [the] debt" suggest that subsection (b) is at issue. Ocwen, however, has addressed subsection (a) in its memorandum, and the Moores have not disagreed with or sought to correct this understanding. This distinction is, in any event, irrelevant, as the Moores' claim fails no matter which subsection it involves.

Insofar as the Moores' claim arises from Ocwen's alleged failure to send a notice as required by subsection (a), it fails because the Moores had already been provided with the requisite notice. It is undisputed that on July 27, 2009, Harmon, acting on behalf of Saxon, sent the Moores a letter that complied in all respects with § 1692g(a).[6] The majority of courts to examine the

---

[6]In pertinent part, the letter informed the Moores that Harmon was attempting to collect a debt in the amount of $493,555.36 owed to MERS. It continued:

Unless you, within thirty days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this office. If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of the judgment against you, if any, and a copy of such verification or judgment will be mailed to you by this office. Upon your written request within the thirty-day period, this

issue have concluded that "one communication with proper
validation notice is all that is required for each debtor when
contacted by the first debt collector, no matter how long the
line of debt collectors to follow." Waters v. J.C. Christensen &
Assocs., Inc., No. 08-cv-11795, 2011 WL 1344452, *11 (D. Mass.
Mar. 4, 2011); see also Oppong v. First Union Mortg. Corp., 566
F. Supp. 2d 395, 403-04 (E.D. Pa. 2008); Nichols v. Byrd, 435 F.
Supp. 2d 1101, 1107 (D. Nev. 2006); Senftle v. Landau, 390 F.
Supp. 2d 453, 473 (D. Md. 2005).  This court agrees with that
conclusion.

As those courts have observed, Congress, in drafting
§ 1692g(a), used the definite article "the" when describing which
"initial communication" would trigger the notice requirement.
See Waters, 2011 WL 1344452 at *11; Nichols, 435 F. Supp. 2d at
1106-07; Senftle, 390 F. Supp. 2d at 473.  "The" indicates that
there can be but one "initial communication" with any given
consumer; were multiple "initial communications" a possibility,
Congress would likely have employed the indefinite article "an,"
or perhaps the possessive "its" (to refer to each debt
collector's first communication with the consumer).  Or, as the

office will provide you with the name and address of
the original creditor, if different from the current
creditor.
Letter of July 27, 2009 (document no. 123-7).  This information
is exactly what the statute requires.  See 15 U.S.C. § 1692g(a).

Senftle court observed, Congress could have explicitly required both "initial and successive debt collectors to provide the § 1692g(a) validation notice," and in fact "made such distinctions in § 1692e(11) when it distinguished between initial and subsequent communications to a debtor on a given debt." Id. (emphasis omitted).

The court acknowledges that other courts have reached the opposite conclusion. See, e.g., Stair ex rel. Smith v. Thomas & Cook, 254 F.R.D. 191, 196-97 (D.N.J. 2008). This court respectfully disagrees with the conclusion reached in those cases, which follows from concerns "that the FDCPA's purpose--'to eliminate abusive debt collection practices'--would be undermined if subsequent debt collectors were excused from complying with the requirements contained in section 1692g." Id. (internal citation omitted). Such concerns cannot justify a departure from the straightforward language of the statute, and they are, in any event, unfounded. "Once the validation information is provided . . . , and once the debtor is made aware of his rights at the time the collection process begins, it would serve no purpose to require that the same information be given again and again, each time the servicing function was passed from one [debt collector] to another." Waters, 2011 WL 1344452 at *11 (quoting Oppong, 566 F. Supp. 2d at 404). Because the Moores had already received a

14

§ 1692g(a) validation notice from Harmon in the summer of 2009, Ocwen was not required to send a new notice to the Moores when it undertook its efforts to collect their debt.

It follows from this conclusion that Ocwen cannot have violated subsection (b) by failing to "properly verify the debt" and "cease any and all collection efforts" after receiving the Moores' request for debt verification.  Subsection (b) requires a debt collector to fulfill these obligations only "[i]f the consumer notifies the debt collector in writing within the thirty-day period" following his or her receipt of the validation notice.  15 U.S.C. § 1692g(b).  The Moores admit that they "did not seek to have the debt validated until December 7, 2009," Pls.' Opp. to Ocwen Mot. for Summ. J. (document no. 129) at 8--more than four months after Harmon's validation notice was sent, and, therefore, three months after the statutory deadline.  So the Moores' letter did not require Ocwen to observe § 1692g(b)'s requirements, and it cannot be held liable for its alleged failure to do so.

## C.    *Count 6 - New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act*

Count 6 of the complaint alleges that Ocwen violated the UDUCPA "by causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously or at unusual

times known to be inconvenient with the intent to abuse, oppress

or harass."[7]  Third Am. Compl. (document no. 47) at ¶ 105

(quoting N.H. Rev. Stat. Ann. § 358-C:3).  Ocwen argues that the

Moores have no competent, admissible evidence in support of this

claim.  The court agrees.

The only evidence in the summary judgment record regarding

the number, frequency, date, or time of any phone calls to the

Moores is a handwritten log that appears to list, in non-

chronological order, the dates and times of more than 40

telephone calls between December 8, 2009 and January 19, 2010

(i.e., an average of roughly one per day over that period of

time).  The log relates that the calls generally occurred in the

mornings, no earlier than 8 a.m., that the latest call occurred

just before 5 p.m., that there were often multiple calls on the

same day--sometimes just minutes apart--and that many of the

calls were either missed or hang-ups.  There is no indication

about the telephone numbers from which the calls were made, or

---

[7]Count 6 also advances a UDUCPA claim against Harmon, but
the court dismissed that claim on Harmon's motion under Rule
12(b)(6).  See Moore, 848 F. Supp. 2d at 125-26.  In addition,
that count alleges that Ocwen violated the UDUCPA "[b]y
repeatedly attempting to contact the Plaintiffs, knowing that a
loan modification application was in process."  Third Am. Compl.
(document no. 47) at ¶ 104.  The Moores' objection does not
pursue that theory, and the court does not, in any event, see how
merely contacting a debtor after the debtor has requested a
modification to the debt (which is the worst the evidence before
the court shows) conceivably violates the UDUCPA.

received, or the length and subject-matter of the calls that were answered.  The court takes the Moores to rely on the log as a record of calls that Ocwen made to them, though there is no actual testimony to that effect in the record.

Assuming for the sake of argument that the pattern of calls related in the log would make out a claim under the UDUCPA (and that Ocwen actually placed the calls), the Moores cannot rely upon the log to support such a claim.  As defendants argue, it is an out-of-court statement offered "to prove the truth of the matter asserted" (i.e., that calls were actually received on the dates and at the times in question), Fed. R. Evid. 801(c), and therefore qualifies as inadmissible hearsay under Rule 802 of the Federal Rules of Evidence unless it falls within some exception to or exemption from the hearsay rule.  See, e.g., Pugliese v. Prof'l Recovery Serv., Inc., No. 09-cv-12262, 2010 WL 2632562, *5 (E.D. Mich. June 29, 2010) (striking similar call log from summary judgment record as hearsay).  The Moores have not identified any such exception or exemption (and, indeed, maintain that they do not seek "to enter their call log into evidence," Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 9).

The log could potentially be admitted under Rule 803(5) as a recorded recollection.  For that to be the case, though, the Moores would need to show that the log "is on a matter [they]

17

once knew about but now cannot recall well enough to testify fully and accurately," that it "was made or adopted . . . when the matter was fresh in [their minds]," and that it "accurately reflects [their] knowledge." Fed. R. Evid. 803(5). The Moores have not argued that these factors are present, and from the record before the court, it is not possible to arrive at that conclusion. There is, for example, no indication that the log was made "when the matter was fresh" in the Moores' minds; to the contrary, Mr. Moore testified that although he "would try and write [the calls] down as they happened," he was not always able to do so, and created the log by going "back into my phone, . . . through my call records and find[ing] the missed calls or the hang-ups."

Because the record does not permit the court to conclude that the log falls within any exception or exemption to the hearsay rule, the court cannot consider it. See, e.g., Dávila v. Corporación de Puerto Rico para la Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment."). And, as noted, the log is the only evidence in the record before the court that arguably permits a conclusion that Ocwen called the Moores "repeatedly or continuously or at unusual times known to be inconvenient," as alleged in the complaint. The Moores could

18

have submitted affidavits attesting to their recollection of the number of frequency of calls Ocwen made to them--or, at the very least, to the factors necessary to conclude that the log qualifies as a recorded recollection under Rule 803(5).  They could have submitted deposition testimony on these topics.  They did not do either of these things, though, and in the absence of any admissible evidence that Ocwen violated the UDUCPA, the court is constrained to grant summary judgment to Ocwen on Count 6.

D.   *Counts 8 & 11 - Fraud and negligent misrepresentation*

Counts 8 and 11 of the Moores' complaint advance claims against Saxon and Ocwen for common-law fraud and negligent misrepresentation.[8]  Both counts allege that these defendants made misrepresentations about loan modifications while servicing Mrs. Moore's loan; the thrust of the Moores' allegations is that Saxon and Ocwen both falsely stated that they were considering Mrs. Moore for a loan modification, and that the Moores took various actions in reliance on these statements.  See Third Am. Compl. (document no. 47) ¶¶ 123-24, 147-50; see also Moore, 848 F. Supp. 2d at 130-32.  As defendants' motions for summary judgment point out, there is no evidence confirming these

---

[8]Insofar as Counts 8 and 11 alleged fraud and negligent misrepresentation by other defendants, the court previously dismissed those counts.  See Moore, 848 F. Supp. 2d at 130-32.

19

allegations, and in fact, the record evidence shows that Saxon actually <u>offered</u> Mrs. Moore a loan modification--which she declined.[8]  <u>See</u> <u>supra</u> Part II.

Perhaps recognizing the futility of their claim that the defendants misled them about the availability of a loan modification, the Moores' objections to the defendants' motions attempt to recast their fraud and negligent misrepresentation claims.  The Moores now claim that Saxon and Ocwen falsely represented that "they had a right to collect on and enforce the Note on behalf of Defendant Deutsche [Bank]," which, the Moores say, did not hold Mrs. Moore's note at that time.  <u>See</u> Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 11; <u>see</u> <u>generally</u> Pls.' Obj. to Saxon Mot. for Summ. J. (document no. 130).  The Moores have presented no evidence substantiating this assertion--which the court finds somewhat dubious given the uncontroverted evidence that Deutsche Bank presently holds the note, <u>see</u> <u>infra</u> Part III.E.--and it is too late for the Moores to

---

[8]The Moores' objection to Ocwen's motion suggests that "Ocwen's own servicing records . . . show [that it] continued to encourage Plaintiffs to seek a loan modification when [it] reasonably knew [that it] had no intention of doing anything more than continuing to request information already provided to [it] to buy [itself] more time as the Plaintiffs slipped deeper into default."  Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 11.  Having reviewed all 32 barely legible pages of servicing records the Moores cite, the court was unable to find anything remotely corroborating this assertion.

hitch their wagon to another star in any event.  A party may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." Calvi v. Knox Cnty., 470 F.3d 422, 431 (1st Cir. 2006).  Summary judgment is granted to the defendants on Counts 8 and 11.

### E.    Count 17 - *"Avoidance of note"*

Finally, in Count 17 of their complaint, the Moores directly challenge the defendants' ability to enforce the promissory note, alleging that they "have been unable or unwilling to provide the Plaintiffs with evidence that they hold the original of the Note or Mortgage."  Third Am. Compl. (document no. 47) at ¶ 184. Because "[a]ctual possession of the original of the note is a necessary legal prerequisite to enforcement of the Note," the Moores say, none of the defendants may enforce the Note against them.  Id. ¶¶ 185-86.  In response to these allegations, Ocwen and Deutsche Bank have proffered the original promissory note, indorsed in blank, which, defendants attest, Ocwen holds as servicer on Deutsche Bank's behalf.

As this court has previously noted, promissory notes are negotiable instruments "subject to the provisions of Article 3 of the Uniform Commercial Code ("UCC"), N.H. Rev. Stat. Ann. § 382-A:3-101 et seq." LeDoux v. JP Morgan Chase, N.A., 2012 DNH 194, 11.  Under the UCC, when an instrument is indorsed in blank, as

21

the Moores' note has been, it "becomes payable to bearer and may be negotiated by transfer of possession alone." N.H. Rev. Stat. Ann. § 382-A:3-205(b). That is to say, the bearer becomes a holder entitled to enforce the instrument. Id. § 382-A:3-301. Given that Deutsche Bank, through Ocwen, possesses the original, indorsed note, it would seem that Count 17 necessarily fails. Cf., e.g., In re Samuels, 415 B.R. 8, 20 (Bkrtcy. D. Mass. 2009) ("By virtue of its possession of a note indorsed in blank, Deutsche Bank is the holder of the note and as such has standing in this case to seek payment thereof.").

The Moores--who, it bears noting, have the burden of proving that defendants do not hold the note--seek to avoid this conclusion, but have presented no evidence of their own. They have not, for example, proffered another note that they purport is the original, nor have they identified any other person or entity who claims to actually hold their note. Instead, they advance a smorgasbord of unpersuasive arguments attacking the genuineness of the note defendants have proffered, among other things. To wit:

• They argue that the affiant who attested that the note defendants proffered is in Ocwen's and Deutsche Bank's possession cannot authenticate the document because she does not have "personal knowledge of anything having to do with the Moore loan." Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 12. The note, however, is commercial paper that is self-authenticating under Federal Rules of Evidence 902(9), and need not be independently authenticated

in the absence of a specific denial of its authenticity--
which plaintiffs have not made.  See, e.g., In re Cook, 457
F.3d 561, 566 (6th Cir. 2006) (A "promissory note is self-
authenticating evidence."); United States v. Varner, 13 F.3d
1503, 1508-09 (11th Cir. 1994) ("Mere production of a note
establishes prima facie authenticity and is sufficient to
make a promissory note admissible.").

- They observe that Ocwen and Saxon produced multiple copies
  of the note during discovery, some of which were not
  indorsed.  The Moores apparently take this to show that
  either the note now in Ocwen's and Deutsche Bank's
  possession is not the original, or the indorsement is
  fabricated.  As defendants argue, though, at most these
  multiple copies of the note demonstrate "that a photo copy
  of the note was made at some point prior to the endorsement
  [sic]," and that the copy made its way into the hands of the
  loan's servicers, Ocwen Reply Br. (document no. 135) at 3,
  which casts no serious doubt on the authenticity of the
  indorsed version of the note.  (Notably, the Moores do not
  contend that Ocwen or Saxon ever represented that the
  unindorsed notes they produced were copies of the original.)

- They assert that because the indorsement has no date--which,
  they candidly acknowledge, is not required by New Hampshire
  law, see Bolduc v. Beal Bank, SSB, 994 F. Supp. 82, 93 n.10
  (D.N.H. 1998)--the court should view it "with great
  skepticism and not blindly accept that it was made prior to
  the start of a foreclosure process."  Pls.' Obj. to Ocwen
  Mot. for Summ. J. (document no. 129) at 13.  Here, however,
  the claim the Moores have advanced in Count 17 is not that
  the defendants improperly initiated foreclosure without
  possessing the note--it is that the defendants do not
  possess the note or have the right to enforce it at
  present.[9]  The only fact material to that claim is that the

---

[9]The Moores claim otherwise, asserting that the key question
is either "whether or not any of the Defendants had standing to
foreclose when they began the non-judicial foreclosure process,"
Statement in Supp. of Objs. to Mots. for Summ. J. (document no.
140), or "who had the right (or lacked the right) to enforce the
Note at the time the action began," Pls.' Surreply to Ocwen Mot.
for Summ. J. (document no. 137) at 3.  That is not, however, the
claim pleaded in the complaint, and when the court, in its order
on the defendants' motions to dismiss, interpreted Count 17 "as

note has been indorsed in blank and Deutsche Bank currently
possesses it; it is irrelevant when that indorsement
occurred.

- They seek to paint defendants' statements as to who
currently holds the note as inconsistent, noting that Ocwen
stated in its interrogatory responses that the note was in
Deutsche Bank's possession, and that defendants' memorandum
and supporting documents now state at different points that
Ocwen, Deutsche Bank, and their counsel are all in
possession of the note.  Any inconsistency in the
defendants' various statements is imagined:  they are all
consistent with the understanding that Deutsche Bank is the
legal holder of the note; that Ocwen, acting as Deutsche
Bank's agent, actually possesses the physical note; and that
Ocwen has temporarily relinquished possession of the note to
its counsel in this action for purposes of the present
motion.

- Finally, they profess that "[a]ccording to the Pooling and
Servicing Agreement [associated with the Trust that this
loan is alleged to be part of] . . .  Wells Fargo and/or
LaSalle Bank is supposed to be the document custodian which
means that they should be the entities with physical
possession [of the note]."  Pls.' Obj. to Ocwen Mot. for
Summ. J. (document no. 129) at 15.  But who is "supposed to
be" in possession of the note is not relevant to who may
enforce it; rather, as already discussed, under the UCC a

---

seeking a declaratory judgment that the defendants may not
enforce the note against the Moores," Moore, 848 F. Supp. 2d at
137--a claim dependent upon defendants' right to enforce the note
at the time of trial--the Moores did not object or otherwise seek
to correct the court's understanding.  As already mentioned,
"[i]t is well settled that plaintiffs are generally not permitted
to raise brand new theories of their case in opposition to a
motion for summary judgment."  Agri-Mark, Inc. v. Niro, Inc., 233
F. Supp. 2d 200, 207 (D. Mass. 2002); see also Calvi, 470 F.3d at
431.  That rule applies with particular force where, as here, the
plaintiffs are on the fourth iteration of their complaint.  And
even assuming the Moores could shift their theory of recovery at
this late juncture, they have presented no evidence that supports
their theory that Deutsche Bank did not hold the note at the time
of foreclosure or at the time this action began.  See supra Part
III.D.

note indorsed in blank becomes enforceable by the bearer. See N.H. Rev. Stat. Ann. §§ 382-A:3-205(b), 3-301; cf. also Millon v. JPMorgan Chase Bank, N.A., No. 11-cv-410, 2012 WL 1854785, *5 (W.D. Mo. May 21, 2012) ("No genuine issue exists that the note is bearer paper and Deutsche Bank is in possession of it.  Deutsche Bank is thus the holder of the note . . . . [Plaintiff's] argument that ownership or holder status of the note cannot be traced through the record of securitization documents is irrelevant.").[10]

Because the Moores have not shown a genuine issue of material fact as to Deutsche Bank's possession of their note, summary judgment is granted to defendants on Count 17.

## IV. **Conclusion**

For the reasons set forth above, the defendants' motions for summary judgment[11] are GRANTED.  The clerk shall enter judgment accordingly and close the case.

---

[10]The Moores also point out that the copy of the note filed on the docket in this case "contains redacted information," and assert that "an original would not have blacked out information." Pls.' Obj. to Ocwen Mot. for Summ. J. (document no. 129) at 12. Even if the premise of this argument were colorable (it is not), both Rule 4.2(b)(1) of this court's Supplemental Rules for Electronic Case Filing and Federal Rule of Civil Procedure 5.2(a) required the information in question to be redacted.  The Moores do not claim to have been denied access to an unredacted copy of the indorsed note.

[11]Documents nos. 123, 124, 126.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  April 25, 2013

cc:  Angela Jo Moore (pro se)
     M. Porter Moore (pro se)
     David E. Fialkow, Esq.
     Michael R. Stanley, Esq.
     Brian S. Grossman, Esq.
     Peter G. Callaghan, Esq.
     Scott C. Owens, Esq.